**DEX MEDIA WEST, INC., et al., Plaintiffs,**

v.

**CITY OF SEATTLE, Defendant.**

**Case No. C10–1857JLR.**

United States District Court, W.D. Washington, at Seattle.

June 28, 2011.

Kathleen M. O'Sullivan, Noah G. Purcell, David J. Burman, Perkins Coie, Seattle, WA, for Plaintiffs.

Gregory Colin Narver, Seattle City Attorney's Office, Jessica L. Goldman, Molly A. Terwilliger, Summit Law Group, William C. Foster, Seattle City Attorney, Seattle, WA, for Defendant.

## ORDER

JAMES L. ROBART, District Judge.

### I. INTRODUCTION

This matter comes before the court on Plaintiffs Dex Media West, Inc. ("Dex"), SuperMedia, LLC ("Supermedia"), and Yellow Pages Integrated Media Association's ("YPA") (collectively "Plaintiffs") motion for partial summary judgment with regard to their claims under the First Amendment and the Commerce Clause (Dkt. # 14) and Defendant City of Seattle's ("City") cross-motion for partial summary judgment with regard to the same claims (Dkt. # 28) filed in response. Having reviewed the submissions of the parties, the relevant law, and having heard oral argument on July 7, 2011, the court DENIES Plaintiffs' motion and GRANTS Defen-

dant's cross-motion for partial summary judgment.[1]

## II. BACKGROUND & FINDINGS OF FACT

### A. The Ordinance

Over a period of six public meetings, between June and October 2010, the City heard testimony from residents who were frustrated by the delivery of unwanted yellow pages directories to their homes. (Rasmussen Decl. (Dkt. # 30) ¶ 4.) Many of these deliveries occurred despite residents' requests under Plaintiffs' opt-out services that Plaintiffs cease delivery of the yellow pages directories to particular residents' homes. (*Id.*) Residents complained that these unwanted deliveries violated their right to privacy and pointlessly generated large amounts of waste. (*Id.*; *see also* O'Brien Decl. (Dkt. # 32) Ex. 2 (attaching copies of complaints emailed to the City).)

In October 2010, the City enacted Ordinance 123427, which bans the distribution of "yellow pages phone books" in Seattle unless telephone phone book publishers meet certain conditions. First, phone book publishers must "obtain[ ] an annual yellow pages phone book distributor license," "separate from and in addition to ... the business license required pursuant to [SMC] chapter 5.55." SMC 6.225.030.[2] Second, publishers or "distributors" must pay the City 14 cents "for each yellow pages book distributed within the City." SMC 6.255.100(A).[3] Third, publishers must "prominently and conspicuously display on ... the front cover of each yellow pages phone book distributed within the City" and "on their websites" a message mandated by the City about the City's program for opting out of receiving phone books. SMC 6.255.110. Finally, the Ordinance creates an "Opt–Out Registry ... for residents and businesses to register and indicate their desire not to receive delivery of some or all yellow pages phone books." SMC 6.255.090(A).

The Ordinance defines a "[y]ellow pages phone book" as "a publication that consists primarily of a listing of business names and telephone numbers and contains display advertising for at least some of those businesses." SMC 6.255.025(D). "Distribution" is defined to mean "the unsolicited delivery of more than four tons annually of yellow pages phone books to the addresses of residents and businesses within the City, but does not include the delivery of yellow pages phone books by membership organizations to their members or to other outside residents or businesses requesting or expressly accepting delivery." SMC

---

1. On May 11, 2011, Plaintiffs filed a notice of appeal concerning the court's denial of their motion for preliminary injunction. (Dkt. # 68.) Ordinarily, an appeal to the Ninth Circuit Court of Appeals divests the district court of jurisdiction. An appeal of the denial of a motion for preliminary injunction, however, is an appeal from an interlocutory order. Accordingly, this court retains jurisdiction to consider the parties' motions for summary judgment. *See, e.g., Plotkin v. Pac. Tel. & Tel. Co.,* 688 F.2d 1291, 1293 (9th Cir.1982) ("[I]t is firmly established that an appeal from an interlocutory order does not divest the trial court of jurisdiction to continue with other phases of the case."); *see also Sierra Forest Legacy v. Rey,* 577 F.3d 1015, 1019 (9th Cir.2009) ("When the district court denied the [preliminary] injunction, [plaintiff] brought its initial appeal to [the Ninth Circuit], but the underlying summary judgment motions remained before the district court.").

2. The annual license fee is one hundred dollars ($100.00). SMC 6.255.060.

3. On January 31, 2011, the City amended the Ordinance to eliminate a $148 per ton recovery fee for the cost of recycling that the City had originally enacted with the Ordinance. (O'Brien Decl. Ex. 1.) The 14 cent distribution fee, however, remains.

6.255.025(B). "Membership organization" is defined to mean "an organization that is organized and operated primarily or exclusively for the purpose of providing services or benefits to a designated group of members (identified, for example, by having to pay membership dues or participating in membership events)." SMC 6.255.025(C).

Three purposes motivated the City in its decision to enact the Ordinance: waste reduction, protection of residents' privacy from unwanted intrusions, and the recovery of costs incurred to maintain and enforce the opt-out registry. (Mullins Decl. (Dkt. # 17) Ex. A, Preamble to Ordinance; Third Rasmussen Decl. (Dkt. # 52) Ex. 9.) The Ordinance took effect in mid-November, 2010. (*See* Third Rasmussen Decl. Ex. 9.) As of May 12, 2011, City residents had made 136,651 opt-out requests through the City's opt-out system—averaging 17,081 new opt-outs per day. (Second Teller Decl. (Dkt. # 71) ¶ 2.)

**B. Yellow Pages Phone Books**

Washington requires local exchange carriers ("LECs"), such as Qwest and Verizon, to publish and distribute residential and business listings, as well as certain other consumer information. *See* WAC 480–120–251. Neither Dex nor SuperMedia are LECs. (Norton Decl. (Dkt. # 18) Ex. A. ¶ 9.) Nevertheless, Dex contracts to publish directories that satisfy these requirements on behalf of Qwest, while SuperMedia does the same on behalf of Verizon. (*Id.*) Directory companies, such as Dex and SuperMedia, do not charge residents or businesses for this service. (*Id.* ¶¶ 12–13.) Dex and SuperMedia utilize advertising to defray the cost of printing and distribution. (*Id.* ¶ 17.)

The directories published by Dex and SuperMedia are commonly called "yellow pages." (*Id.* ¶ 7.) The contents of a yellow pages directory typically include a business "white pages" section, providing the names, addresses, and telephone numbers of local businesses and professionals. (*See* Stonecipher Decl. (Dkt. # 19) ¶ 5.) The Dex 2010 Seattle Metro Directory contains 404 such pages. (*Id.*) Further, a yellow pages directory typically contains a section of public-interest material such as community information, maps, and government listings. (*See id.* ¶ 6.) The Dex 2010 Seattle Metro Directory contains nearly 100 pages of such information. (*See id.*) Finally, the publication contains listings of businesses by category of product or service. (*See id.* ¶ 5; Mot. (Dkt. # 14) at 6.) This section, which comprises 844 pages in the Dex 2010 Seattle Metro Directory, contains a significant amount of advertising. (*Id.; see also* Dex 2010 Seattle Metro Directory (*see* Dkt. ## 20, 22).) Although advertising can be found in every section of the Dex 2010 Seattle Metro Directory, including the front and back covers (*see id.; see also infra* note 5), overall it typically comprises less than half of the content of a typical yellow pages directory (Norton Decl. ¶ 24). Display advertising, in-column display, coupons, and advertising on the cover and tabbed inserts comprise approximately 35% of the Dex 2010 Seattle Metro Directory. (Stonecipher Decl. ¶ 8.) Similarly, display advertising ranges from 15–35% of SuperMedia's Seattle area yellow pages directories. (Gatto Decl. (Dkt. # 16) ¶ 4.)

**III. ANALYSIS & CONCLUSIONS OF LAW**

**A. Summary Judgment Standard**

Summary judgment is appropriate if the evidence, when viewed in the light most favorable to the non-moving party, demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91

L.Ed.2d 265 (1986); *Galen v. County of Los Angeles,* 477 F.3d 652, 658 (9th Cir. 2007). The moving party bears the initial burden of showing there is no genuine issue of material fact and that he or she is entitled to prevail as a matter of law. *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548. If the moving party meets his or her burden, then the non-moving party "must make a showing sufficient to establish a genuine dispute of material fact regarding the existence of the essential elements of his case that he must prove at trial" in order to withstand summary judgment. *Galen,* 477 F.3d at 658. In adjudicating cross-motions for summary judgment, the Ninth Circuit "evaluate[s] each motion separately, giving the nonmoving party in each instance the benefit of all reasonable inferences." *ACLU of Nevada v. City of Las Vegas,* 466 F.3d 784, 790–91 (9th Cir.2006) (citations omitted); *see also Friends of Columbia Gorge, Inc. v. Schafer,* 624 F.Supp.2d 1253, 1263 (D.Or.2008).

## B. The City's Ordinance Does Not Violate the First Amendment

### 1. Yellow Pages Directories Are Commercial Speech

█ Plaintiffs allege that yellow pages directories constitute "fully protected," noncommercial speech, entitled to the highest level of First Amendment protection, and that accordingly, the City's Ordinance which regulates the distribution of those directories violates the First Amendment. (Mot. at 11–15.) The degree of protection afforded by the First Amendment depends on whether the activity sought to be regulated constitutes commercial or noncommercial speech. *Bolger v. Youngs Drug Prods. Corp.,* 463 U.S. 60, 65, 103 S.Ct. 2875, 77 L.Ed.2d 469 (1983). With respect to noncommercial speech, "content-based restrictions [are permitted] only in the most extraordinary of circumstances." *Id.* However, "the Constitution accords less protection to commercial speech than to other constitutionally safeguarded forms of expression." *Id.* at 64–65, 103 S.Ct. 2875. "[C]ontent-based restrictions on commercial speech may be permissible." *Id.* at 65, 103 S.Ct. 2875. Thus, the court must first determine the proper classification of the publications at issue. Are yellow pages directories commercial or noncommercial speech?

█ "Although the boundary between commercial and noncommercial speech has yet to be clearly delineated, the 'core notion of commercial speech' is that it 'does no more than propose a commercial transaction.'" *Mattel, Inc. v. MCA Records, Inc.,* 296 F.3d 894, 906 (9th Cir.2002) (quoting *Bolger,* 463 U.S. at 66, 103 S.Ct. 2875). The Supreme Court has defined commercial speech as "expression related solely to the economic interests of the speaker and its audience." *Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.,* 447 U.S. 557, 561, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980). Any consideration of whether speech is commercial should rest on "'the commonsense' distinction between speech proposing a commercial transaction, which occurs in an area traditionally subject to government regulation, and other varieties of speech." *Bolger,* 463 U.S. at 64, 103 S.Ct. 2875.

█ Under *Bolger,* "[w]here the facts present a close question, 'strong support' that the speech should be characterized as commercial speech is found where the speech is an advertisement, the speech refers to a particular product, and the speaker has an economic motivation" for engaging in the speech. *Hunt v. City of Los Angeles,* 638 F.3d 703, 715 (9th Cir. 2011) (citing *Bolger,* 463 U.S. at 66–67, 103 S.Ct. 2875). In applying this test, a finding of just one of the factors does not make speech commercial. *See Bolger,* 463 U.S. at 67, 103 S.Ct. 2875. Rather, "the combination of *all* of these characteristics

... provides strong support for the ... conclusion that the [speech in question can be] properly characterized as commercial speech." *Id.* (italics in original).

In *Bolger,* the Supreme Court held that condom pamphlets, which were produced and distributed by a contraceptives manufacturer, and which contained advertising as well as discussions of family planning and disease prevention, were properly regulated as commercial speech. *Id.* at 66, 103 S.Ct. 2875. Although the Court noted that the pamphlets could not "be characterized merely as proposals to engage in commercial transactions" and contained discussion of important public information, they were properly characterized as commercial speech because they were advertisements, referenced specific products, and the publisher had an economic motivation for mailing them. *Id.* at 66–68, 103 S.Ct. 2875.

■ In the present case, Plaintiffs argue that yellow pages directories should receive the highest level of First Amendment protection because each publication provides a guide not only to commercial activities, but also to community, public safety, and political information. (Mot. at 12.) The court disagrees. Although yellow pages directories, like the pamphlets in *Bolger,* "cannot be characterized merely as proposals to engage in commercial transactions," 463 U.S. at 66, 103 S.Ct. 2875, a consideration of the three factors outlined in *Bolger* dictates that yellow pages directories constitute commercial speech. First, yellow pages directories contain many advertisements for many different products.[4] Indeed, as noted above, various forms of advertising comprise approximately 35% of the Dex 2010 Seattle Metro Directory and approximately 15–35% of SuperMedia's Seattle area yellow pages directories. (Stonecipher Decl. ¶ 8; Gatto Decl. ¶ 4.) Second, yellow pages directories reference specific products. For example, the front cover of the Dex 2010 Seattle Metro Directory contains a specific advertisement for Geico Auto Insurance, while the back cover contains an advertisement for South West Plumbing. (Dex 2010 Seattle Metro Directory (*see* Dkt. ## 20, 22).) In fact, that same directory contains myriad specific advertisements for Dex itself and Dex's advertising services. (*See, e.g., id.* at Business Yellow Pages 9 ("Discover Directory Advertising Services from Dex"), 10, 11, 17, 18, 29, 38, 41, 43, 51, 52, 53, 54, 57, 58, 68, 69.)[5] Third, Plaintiffs have an economic interest or motive in publishing the directories and delivering the yellow pages to residents' doorsteps. (*See* Norton Decl. ¶¶ 17–20; *see also* Baldasty Decl. (Dkt. # 15) ¶ 7.) Originally, the LECs published the resi-

4. (*See, e.g.,* Dex 2010 Seattle Metro Directory (*see* Dkt. # 22) at Business White Pages at 1, 5, 12, 27, 35, 39, 42; Business Yellow Pages at 6, 30, 31, 38, 39, 44, 45; Government Pages at 66 ("You deserve a vacation. Call now ..."); Community Pages at 11 ("Call now to learn how to donate your car").)

5. During oral argument, Plaintiffs' counsel asserted that under *Board of Trustees of State University of New York v. Fox,* 492 U.S. 469, 109 S.Ct. 3028, 106 L.Ed.2d 388 (1989), whether the speaker is the advertiser or seller, or whether the speaker is merely the publisher of advertisements obtained from others makes a difference with regard to First Amendment analysis. In other words, Plaintiffs' counsel implies that the publisher of an advertisement may be entitled to greater First Amendment protection than the advertiser or seller itself. While the court can certainly imagine scenarios in which this might be true, the issue is not one the court needs to decide in the context of this case. As discussed above, the record before the court demonstrates that the Dex 2010 Seattle Metro Directory contains numerous advertisements for Dex's own advertising services. Thus, although Dex may be a publisher of others' advertisements, under the facts presented to the court, it is a seller and advertiser of its own services as well.

dential and business listings contained in the yellow pages. (*See* Norton Decl. ¶ 7.) Plaintiffs recognized the "potential profitability of display and other advertising" in yellow pages directories, however, and have contracted with LECs to publish the residential and business listings as a part of their yellow pages directories. (*Id.* ¶¶ 9, 17; *see also* Rasmussen Decl. Exs. 5–6.)

■ Besides the *Bolger* factors, commonsense—the touchstone of the commercial speech doctrine—dictates that the yellow pages directories should not receive the highest level of protection afforded by the First Amendment. *See, e.g., Central Hudson,* 447 U.S. at 562–63, 100 S.Ct. 2343. Despite Plaintiffs' emphasis on the percentage of noncommercial material contained within the directories, the presence of noncommercial speech does not alter the commonsense conclusion that yellow pages directories are commercial speech. *See Bolger,* 463 U.S. at 68, 103 S.Ct. 2875 ("We have made clear that advertising which 'links a product to a current public debate' is not thereby entitled to the constitutional protection afforded noncommercial speech.") (quoting *Central Hudson,* 447 U.S. at 563 n. 5, 100 S.Ct. 2343). In fact, one of the pamphlets considered by the Supreme Court in *Bolger* contained only one reference to a product on the bottom of the last page of an eight-page pamphlet. *Bolger,* 463 U.S. at 67 n. 13, 103 S.Ct. 2875. Nevertheless, the Supreme Court still found the overall character of the informational pamphlet to be commercial in nature. *Id.* at 67, 103 S.Ct. 2875. As the Supreme Court has stated, "[a] company has a full panoply of protections available to its direct comments on public issues, so there is no reason for providing similar protection where such statements are made in the context of commercial transactions." *Id.* at 68, 103 S.Ct. 2875 (footnote omitted). Thus, the court finds that Plaintiffs' yellow pages directories are properly

characterized as commercial speech under the First Amendment.

## 2. Commercial and Noncommercial Speech Are Not "Inextricably Intertwined" in the Yellow Pages

■ Plaintiffs nevertheless assert that even if the court were to find that yellow pages directories constitute commercial speech, the directories would still be entitled to the highest level of First Amendment protection because the commercial speech in the directories is "inextricably intertwined" with fully protected noncommercial speech. (Mot. at 14.) Commercial speech does not retain its commercial character "when it is inextricably intertwined with otherwise fully protected speech." *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.,* 487 U.S. 781, 796, 108 S.Ct. 2667, 101 L.Ed.2d 669 (1988).

The Supreme Court's decisions in *Riley* and *Board of Trustees of State University of New York v. Fox,* 492 U.S. 469, 109 S.Ct. 3028, 106 L.Ed.2d 388 (1989), provide a framework for the court's analysis here. In *Riley,* the Supreme Court considered a state-law requirement that professional fundraisers must include in any appeal for charitable funds information setting forth the percentage of charitable contributions collected during the previous 12 months that were actually turned over to charities (as opposed to retained as commissions). 487 U.S. at 786, 108 S.Ct. 2667; *see also Fox,* 492 U.S. at 474, 109 S.Ct. 3028 (describing *Riley*). The Court has held that charitable fundraising is fully protected speech. *Id.* Assuming without deciding that the statement compelled by the regulation was commercial speech, the Court concluded that the commercial speech was "inextricably intertwined" with the fully protected charitable fundraising. *See id.* (citing *Riley,* 487 U.S. at 796, 108 S.Ct. 2667.) A professional fundraiser could not

engage in fully protected charitable fund-raising without including the arguably commercial portions of the speech because a state law required the commercial portions to be included. *Id.* As a result, the Supreme Court applied its "test for fully protected expression" in evaluating the state law even though portions of the speech may have been considered commercial. *Id.*

Conversely, in *Fox,* the Supreme Court considered a university's refusal to permit product demonstrations, such as Tupperware parties, in dorm rooms. The Court found that there was "no doubt" that the Tupperware parties proposed commercial transactions. 492 U.S. at 473, 109 S.Ct. 3028. The Court also recognized, however, that other subjects were also touched upon during the demonstrations such as "how to be financially responsible and how to run an efficient home." *Id.* at 474, 109 S.Ct. 3028. Nevertheless, the Court rejected the argument that the commercial speech of selling Tupperware and the fully protected discussions of financial responsibility were "inextricably intertwined." *Id.* at 474–75, 109 S.Ct. 3028. Unlike *Riley,* where the state law at issue made it impossible for the noncommercial messages to be delivered without the compelled commercial speech, in *Fox* the Court found that "no law of man or nature makes it impossible to sell housewares without teaching home economics, or to teach home economics without selling housewares." *Id.* at 474, 109 S.Ct. 3028. The *Fox* court elaborated that nothing in the nature of the university's restriction "prevents the speaker from conveying, or the audience from hearing, these noncommercial messages, and nothing in the nature of things requires them to be combined with commercial messages." *Id.* Because the commercial and noncommercial aspects of the demonstrations or Tupperware parties were not inextricably intertwined, the *Fox* Court analyzed the speech as a whole and

the university's regulation of that speech under standards applicable to commercial and not fully protected speech. *Id.* at 475, 109 S.Ct. 3028.

The court here finds the City's Ordinance to be more like the restriction at issue in *Fox* and less like the state law in *Riley.* Unlike *Riley*—where the protected charitable solicitation could not be made without the compelled commercial disclosures—and like *Fox*—where housewares could be sold without teaching economics—nothing in the City's Ordinance nor in the nature of these directories requires that their noncommercial aspects, such as maps, listings, and street guides, be combined with advertising. The two aspects of these directories—the commercial and the noncommercial—are therefore not inextricably intertwined.

Plaintiffs advance three reasons why yellow page advertising is nevertheless inextricably intertwined with fully protected speech. First, Plaintiffs assert that the City could not address its objectives without regulating the combination of commercial and noncommercial speech. (Mot. at 14.) This assertion, however, looks at the question through the wrong lens. The analysis in *Riley* and *Fox* indicates that it is the contents of the speech itself which determine whether the speech is inextricably intertwined, and therefore entitled to heightened protection or not. *See Riley,* 487 U.S. at 796–97, 108 S.Ct. 2667; *Fox,* 492 U.S. at 473–75, 109 S.Ct. 3028. In other words, it is Plaintiffs' objectives, and not the City's, which are determinative of the level of protection accorded to Plaintiffs' speech under the First Amendment.

Second, Plaintiffs contend that like the regulation in *Riley,* the WAC 480–120–251 requires the publication of basic business listings. (Pls. Reply (Dkt. # 37) at 4.) Plaintiffs' attempts to draw an analogy between their circumstances with those of

the plaintiffs in *Riley*, however, fails. While it is true that WAC 480–120–251 requires LECs to publish basic business listings, the Plaintiffs are not LECs. Furthermore, unlike *Riley*, where the restriction at issue required commercial speech to be added to noncommercial speech, here there is no legal requirement that business and residential listings or other noncommercial material be published in conjunction with commercial advertising.

Third, Plaintiffs argue that, like newspapers, the distribution of the noncommercial content is dependent on the funding provided by advertising. (Mot. at 14.) As the Court noted in *Fox*, however, including home economics elements in a Tupperware party would no more convert the parties into educational speech than opening a sales presentation with a prayer or the Pledge of Allegiance would convert it into religious or political speech. *Fox*, 492 U.S. at 474–75, 109 S.Ct. 3028. While advertising may be a convenient way to defray the expense of the state-mandated directories, and while the noncommercial information may render receipt of the advertising contained in these directories more palatable to portions of the public, Plaintiffs point to no legal mandate or other circumstance requiring the combination of the commercial and noncommercial aspects in these directories.

Indeed, Plaintiffs attempt to liken their yellow pages directories to newspapers is a stretch too far for this court. Both common sense and the Supreme Court's jurisprudence tells us that the two cannot be equated. In *Bolger* and *Fox*, the Supreme Court found that the speech at issue was not motivated by or intertwined with the speaker's political message. As courts have recognized, "commenting on public issues in the context of a commercial transaction does not elevate speech from commercial to political rank." *Hays Cnty. Guardian v. Supple*, 969 F.2d 111, 120 (5th Cir.1992). Here too, any noncommercial aspects of the speech at issue in yellow pages directories are merely tangential to Plaintiffs' predominantly commercial purpose. While the noncommercial aspects of the directories may render their receipt more welcome by some residents, these aspects of the directories are not at the core of their purpose.

In contrast, newspapers have played an "historic role" in our democracy "as conveyers of individual ideas and opinions." *Pac. Gas and Elec. Co. v. Pub. Utils. Comm'n of Cal.*, 475 U.S. 1, 33, 106 S.Ct. 903, 89 L.Ed.2d 1 (1986) (Rehnquist, J., dissenting). "Newspapers have traditionally been a major forum for political speech and are at the heart of historical justification for freedom of the press, and courts view with skepticism any law that could have a significantly damaging impact on the Fourth Estate." *Nat'l Coalition of Prayer, Inc. v. Carter*, 455 F.3d 783, 791 (7th Cir.2006) (citing *Minneapolis Star & Tribune v. Minn. Comm'r of Revenue*, 460 U.S. 575, 103 S.Ct. 1365, 75 L.Ed.2d 295 (1983) (invalidating tax on ink that imposed significant burden on newspapers as violation of the First Amendment)).[6] The Supreme Court has recognized the constitutionally unique place the press holds within First Amendment analysis:

> Whatever differences may exist about interpretations of the First Amendment, there is practically universal agreement

---

**6.** *See also Gasparo v. City of N.Y.*, 16 F.Supp.2d 198, 206 (E.D.N.Y.1998) ("[T]he historical purpose of the First Amendment was in large part to protect the free circulation of newspapers and periodicals."); *Century Fed., Inc. v. City of Palo Alto*, 648 F.Supp. 1465, 1472 (N.D.Cal.1986) ("[N]ewspapers, the most traditional form of the media, are historically the source of most of the debate on politics and government at the core of First Amendment values.").

that a major purpose of that Amendment was to protect the free discussion of governmental affairs.... The Constitution specifically selected the press ... to play an important role in the discussion of public affairs .... [, and it is] one of the very agencies the Framers of our Constitution thoughtfully and deliberately selected to improve our society and keep it free.

*Mills v. Alabama,* 384 U.S. 214, 218–19, 86 S.Ct. 1434, 16 L.Ed.2d 484 (1966). While yellow pages directories may play a commercially important role in portions of our community, they simply are not analogous to newspapers in the context of First Amendment analysis. The court, therefore, finds that the various noncommercial aspects of the yellow pages directories are not inextricably intertwined with the commercial aspects.

### C. The Ordinance Satisfies the Intermediate Scrutiny of *Central Hudson*

▮ Having concluded that Plaintiffs' yellow pages directories are properly characterized as commercial speech, the court considers whether the Ordinance violates the First Amendment under the lesser intermediate level of scrutiny applicable to commercial speech. A restriction on commercial speech must satisfy the four-part test announced in *Central Hudson:* (1) the speech concerns lawful activity that is not misleading; (2) the government interest is substantial; (3) the regulation directly advances that interest; and (4) the regulation is not more extensive than necessary. 447 U.S. 557, 566, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980). Here, the parties do not contest the first factor; therefore the court turns to the remaining *Central Hudson* factors.

### 1. The City's Interests are Substantial

▮ The City expresses three primary interests in enacting the Ordinance, sum-marized as (1) waste reduction, (2) resident privacy, and (3) cost recovery. (*See* Resp. (Dkt. # 28) at 8–9; Mullins Decl. Ex. A, Preamble.) First of all, an interest "in promoting resource conservation and reducing the burden on ... brimming landfills" is substantial. *See Ass'n of Nat'l Advertisers, Inc. v. Lungren,* 44 F.3d 726, 735 (9th Cir.1994). Second, governments have a significant interest in protecting residents' privacy. *See Watchtower Bible & Tract Soc'y of New York., Inc. v. Village of Stratton,* 536 U.S. 150, 165, 122 S.Ct. 2080, 153 L.Ed.2d 205 (2002); *Bland v. Fessler,* 88 F.3d 729, 734 (9th Cir.1996). Third, the City's interest in recouping the costs expended in the Ordinance's enforcement and administration is substantial. *See, e.g., Trans. Alts., Inc. v. City of New York,* 218 F.Supp.2d 423, 439 (S.D.N.Y. 2002), *aff'd,* 340 F.3d 72 (2d Cir.2003).

Plaintiffs rely on *Bolger,* 463 U.S. at 72, 103 S.Ct. 2875, however, to argue that the City has no substantial privacy interest in enforcing a resident's decision to disinvite the distribution of yellow pages to their doorstep because residents may simply dump unwanted yellow pages in the trash. (Pls. Reply at 9.) In *Bolger,* the Court rejected the government's interest in shielding residents from receiving potentially offensive advertisements for contraceptives in the mail, because the government's stated interest and the regulation it devised (banning the advertisements unless residents indicate a desire to receive them) were paternalistic. *Id.* at 71–74, 103 S.Ct. 2875. Similarly, in *Sorrell v. IMS Health, Inc.,* the Court rejected the government's interest in protecting doctors from the harassing sales behavior of pharmaceutical companies by restricting the sale of pharmacy records that reveal an individual doctor's prescribing practices unless the doctor opts-in and permits disclosure. *Sorrell v. IMS Health, Inc.,* 564 U.S. ——, 131 S.Ct. 2653, 2668–69, 180

L.Ed.2d 544 (2011). Here, by contrast, the City's interest in the privacy of its citizens does not suffer from the type of paternalism that the Supreme Court rejected in both *Bolger* and *Sorrell*. Unlike the opt-in regulations in *Bolger* and *Sorrell*, the Ordinance creates an opt-out system, where the resident, and not the City, makes the choice not to receive the speech or directories at issue. *Anderson v. Treadwell*, 294 F.3d 453, 464 (2d Cir.2002) (unlike some commercial restrictions where an interest is vulnerable because of paternalism, a resident opt-out ordinance "entirely avoids such concerns because it applies only where homeowners elect to seek its protection"); *see Rowan v. U.S. Post Office Dept.*, 397 U.S. 728, 736–37, 90 S.Ct. 1484, 25 L.Ed.2d 736 (1970) (upholding regulation designed to protect residents' privacy where "the mailer's right to communicate is circumscribed only by an affirmative act of the addressee giving notice that he wishes no further mailings."). Because the City's regulation places the citizen rather than itself in the role of decisionmaker, it avoids the type of governmental paternalism that the Supreme Court has previously rejected, and thus the Ordinance survives Plaintiffs' First Amendment challenge on that basis. *See Sorrell*, 131 S.Ct. at 2669 ("[P]rivate decisionmaking can avoid governmental partiality and thus insulate privacy measures from First Amendment challenge.").

The City needs only to identify one substantial interest to meet the *Central Hudson* test. *See Bland*, 88 F.3d at 734 n. 8 (noting that the government need only identify one substantial interest). Based on the record before the court in the context of this motion for summary judgment, as well as the foregoing case authority, it appears that the City has established three. The court, therefore, concludes that the City has a substantial interest underpinning the Ordinance.

### 2. The Fit Between the Ends and the Means is Reasonable

 The Supreme Court has effectively collapsed the last two *Central Hudson* elements into a single inquiry of whether the City has shown a "reasonable fit" between the government's ends and the means chosen to accomplish those ends. *See City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 415, 113 S.Ct. 1505, 123 L.Ed.2d 99 (1993). This fit requirement does not need to be

> necessarily perfect, but reasonable; that represents not necessarily the single best disposition but one whose scope is in proportion to the interest served, . . . that employs not necessarily the least restrictive means but, as we have put it in the other contexts . . . , a means narrowly tailored to achieve the desired objective.

*Fox*, 492 U.S. at 480, 109 S.Ct. 3028 (internal quotation marks and citations omitted). In other words, regulation of commercial speech (or the means) must simply "provide more than ineffective or remote support for a legitimate governmental policy goal." *Lungren*, 44 F.3d at 732 (internal quotation marks omitted).

 The Ordinance's opt-out registry, recovery fee, and license requirement all "provide more than ineffective or remote support" for the City's stated interests. First, the opt-out registry provides the City a means to enforce residents' choices and is limited because it only restricts delivery to those individuals who do not wish to receive yellow pages directories. *See, e.g., Mainstream Mktg. Servs., Inc. v. Fed. Trade Comm'n*, 358 F.3d 1228 (10th Cir.2004) (upholding "do-not-call" registry).

Second, the "recovery fee is intended to reflect the cost to the City of administering the Opt–Out Registry" and thus is a precise means to recoup the opt-out regis-

try's actual costs. SMC 6.255.100(A). Charges made by cities to recoup expenses incurred as a result of regulation have been upheld even in the realm of fully protected speech. *See, e.g., Kaplan v. County of Los Angeles,* 894 F.2d 1076, 1081 (9th Cir.1990).

Finally, the Ordinance's licensing requirement is a narrowly tailored means of protecting residential privacy and recovering administrative costs.[7] In addition to providing a means for the City to collect distribution data and set proportionate recovery fees, the licensing requirement is a mechanism through which the City may ensure compliance with the opt-out list. *See S.O.C., Inc. v. County of Clark,* 152 F.3d 1136, 1147 (9th Cir.1998) (noting that an acceptable, less-restrictive alternative to banning handbilling would be to issue canvassing permits, and that a "permit system could help regulate congestion and build in accountability should problems arise"), *amended on other grounds,* 160 F.3d 541 (9th Cir.1998).[8]

Plaintiffs rely primarily on *Discovery Network* in support of their argument that the City has failed to establish a reasonable fit between the Ordinance and its interests in waste reduction and resident privacy. In *Discovery Network,* the Court invalidated a city ordinance that prohibited commercial handbills from being displayed in news racks, while allowing ordinary newspapers. 507 U.S. at 413–14, 113 S.Ct. 1505. The Court concluded that the City's regulation violated the First Amendment under the "reasonable fit" standard. *Id.* at 417, 113 S.Ct. 1505. The City of Cincinnati's purported interest was in limiting sidewalk debris, although the ban affected only 62 racks, while leaving some 1,500–2000 racks unaffected. *Id.* at 417–18, 113 S.Ct. 1505. Moreover, the City of Cincinnati's justification for singling out commercial papers was premised on nothing more than a "naked assertion that commercial speech has 'low value.'" *Id.* at 429, 113 S.Ct. 1505. In invalidating the regulation, the Court stated: "Not only does Cincinnati's categorical ban on commercial newsracks place too much importance on the distinction between commercial and non-commercial speech, but in this case, the distinction bears no relationship whatsoever to the particular interests that the city

---

**7.** Citing *O'Day v. King County,* 109 Wash.2d 796, 749 P.2d 142, 146–47 (1988), Plaintiffs argue that even if the licensing system could survive under the federal Constitution, the licensing system would still violate the Washington Constitution which "categorically rules out prior restraints on constitutionally protected speech under any circumstances." (Mot. at 17.) The Washington Supreme Court has since held, however, that Washington's Constitution affords no greater protection to commercial speech than does the First Amendment. *Ino Ino, Inc. v. City of Bellevue,* 132 Wash.2d 103, 937 P.2d 154, 163, *amended in non-relevant part,* 943 P.2d 1358 (Wash. 1997).

**8.** Plaintiffs nevertheless contend that the Ordinance's licensing requirement is a prior restraint on speech. The Ninth Circuit recently noted, however, that "[i]t is an open question whether the prior restraint doctrine even applies to commercial speech." *Hunt,* 638 F.3d at 718 n. 7 (citing *Central Hudson,* 447 U.S. at 571 n. 13, 100 S.Ct. 2343 ("We have observed that commercial speech is such a sturdy brand of expression that traditional prior restraint doctrine may not apply to it.")). Regardless, "[a] 'prior restraint' refers to an ordinance that either 'vests unbridled discretion in the licensor' or 'does not impose adequate time limits on the relevant public officials.'" *Id.* at 718 (quoting *Get Outdoors II, LLC v. City of San Diego,* 506 F.3d 886, 894 (9th Cir.2007)). Neither concern is present here. First, the Ordinance provides specific conditions for obtaining a license and under what conditions the license may be denied. *See* SMC 6.255.060; SMC 6.255.080; SMC 6.255.120; SMC 6.255.130. Second, the Ordinance imposes adequate time limits because the City is required to rule on a license request within 20 days. (O'Brien Decl. Ex. 1.)

has asserted." *Id.* at 424, 113 S.Ct. 1505. Accordingly, the Court found that the ban was "an impermissible means of responding to the city's admittedly legitimate interests." *Id.*

The Supreme Court's "narrow" holding in *Discovery Network* does not undermine the City's Ordinance here. *Id.* at 428, 113 S.Ct. 1505. Plaintiffs argue that just as newspapers in Cincinnati continued to litter the street, the Ordinance here fails because it "imposes no similar requirements on distribution of any other printed material." (Mot. at 22.) Thus, although the City's interests "apply just as strongly to other materials as they do to yellow pages," City residents will continue to receive other unwanted printed materials on their doorsteps. (*Id.*) This analogy fails, however, because the City considered opt-out legislation specifically in response to concerns raised by Seattle residents regarding the unwanted delivery of yellow pages directories. (Rasmussen Decl. ¶ 4.) Thus, while the City of Cincinnati singled out commercial handbills based on nothing more than what it perceived as the lesser speech value of handbills as opposed to newspapers, the decision by the City in this case to single out yellow pages directories bears a direct relationship to the concerns raised by the City's residents and the City's stated interest in protecting its residents' privacy and reducing unwanted waste.

■ Furthermore, the fact that residents will continue to receive "junk" mail or "other printed materials" does not mean that the City has failed to establish a reasonable fit. *See, e.g., World Wide Rush, LLC v. City of Los Angeles.*, 606 F.3d 676, 689 (9th Cir.2010). The government is not required to legislate in a way that wholly eliminates a particular problem; rather, it may advance its goals in piecemeal fashion with a graduated response. *Metro Lights, L.L.C. v. City of Los Angeles,* 551 F.3d 898, 910 (9th Cir. 2009); *see also Mainstream Mktg.*, 358 F.3d at 1238–39 ("The underinclusiveness of a commercial speech regulation is relevant only if it renders the regulatory framework so irrational that it fails materially to advance the aims that it was purposefully designed to further."). Here, the City was faced with specific complaints from its residents concerning the large size of yellow pages directories and resulting waste they engender, the invasion of privacy in having these directories dropped on their doorsteps, as well as the ineffectualness of Plaintiffs' own opt-out systems. (Rasmussen Decl. ¶¶ 3–4.) The Court finds that in light of these specific citizen-generated concerns, the Ordinance is a reasonable fit. "[I]t is precisely coextensive with those who are experiencing the particular harm that it is designed to alleviate." *Anderson*, 294 F.3d at 462. Thus, the court finds that under the *Central Hudson* test, the Ordinance is a reasonable fit between the ends and the means.

■ Finally, this court is mindful that the Supreme Court has "categorically reject[ed] the argument that a vendor has a right under the Constitution or otherwise to send unwanted material into the home of another." *Rowan*, 397 U.S. at 738, 90 S.Ct. 1484. *Rowan* involved a statute which provided householders with a mechanism to opt-out of receiving in the mail from individual senders "pandering advertisements" which the householder believed to be erotically or sexually provocative. *Id.* at 730, 90 S.Ct. 1484. The Supreme Court found that even "[i]f this prohibition operates to impede the flow of even valid ideas, the answer is that no one has a right to press even 'good' ideas on an unwilling recipient." *Id.* at 738, 90 S.Ct. 1484. The *Rowan* court found that the plaintiffs' asserted right to distribute their materials "stop[ed] at the outer boundary of every person's domain." *Id.*; *see also Hill v.*

*Colorado,* 530 U.S. 703, 717, 120 S.Ct. 2480, 147 L.Ed.2d 597 (2000) ("The right to avoid unwelcome speech has special force in the privacy of the home, . . . and its immediate surroundings. . . ."). Similarly, the City's Ordinance provides its residents with a mechanism to communicate their individual wishes not to receive yellow pages directories on their doorsteps, and that the court finds that as such it does not offend the First Amendment.

### D. The City's Required Message Does Not Violate the First Amendment

■ The Ordinance requires Plaintiffs to inform City residents on the cover of Plaintiffs' yellow pages directories and on their websites about the City's opt-out procedure. SMC 6.255.110. Plaintiffs assert that the City's required message is compelled speech in violation of the First Amendment. (Pls. Reply at 11–12.) The Supreme Court has upheld compelled commercial speech where the state required inclusion of "purely factual and uncontroversial information" in advertising. *Zauderer v. Office of Disciplinary Counsel,* 471 U.S. 626, 651, 105 S.Ct. 2265, 85 L.Ed.2d 652 (1985); *see also United States v. Schiff,* 379 F.3d 621, 630–31 (9th Cir. 2004) (holding that government could compel website operator to post factual information about potential criminal liability patrons could face if they used the website to evade taxes); *Video Software Dealers Ass'n v. Schwarzenegger,* 556 F.3d 950, 966

(9th Cir.2009), *aff'd Brown v. Entm't Merch. Ass'n,* —— U.S. ——, 131 S.Ct. 2729, 180 L.Ed.2d 708 (2010).

■ The standard set forth in *Zauderer* applies in this case. In *Zauderer,* the Supreme Court upheld a regulation that required attorneys to provide information about contingency fees in their advertising. *Id.* at 652, 105 S.Ct. 2265. The State's interest in its regulation was to prevent potential deception of the public. *Id.* at 629, 105 S.Ct. 2265. The Court found that "[b]ecause the extension of First Amendment protection to commercial speech is justified principally by the value to consumers of the information such speech provides, . . . appellant's constitutionally protected interest in *not* providing any particular factual information in his advertising is minimal." 471 U.S. at 651, 105 S.Ct. 2265 (citation omitted; emphasis in original). Accordingly, the Supreme Court held that First Amendment rights were "adequately protected as long as disclosure requirements are reasonably related to the State's interest in preventing deception of consumers." *Id.*

■ Based on the foregoing language, Plaintiffs maintain that *Zauderer* requires that any compelled commercial speech must be reasonably related only to a government's "interest in preventing deception of customers." (Pls. Reply at 11–12.) Consequently, they assert that because the City's public service message does not prevent deception it is unconstitutional.[9] *(Id.)*

---

9. The court is not convinced that consumer deception (whether intentional or not) and confusion are not at issue here. Certainly the record before the court is rife with complaints by City residents who continue to receive yellow pages directories on their doorsteps despite repeated attempts to opt-out of such deliveries using Plaintiffs' opt-out systems. *See* Rasmussen Decl. ¶ 4; O'Brien Decl. Ex. 2; Third Rasmussen Decl. Ex. 1. Based on this evidence, it is logical to infer that these residents might indeed feel deceived or confused

when they continue to receive deliveries despite their requests on Plaintiffs' opt-out systems to opt-out of such deliveries, and that providing information about the City's opt-out system, which includes meaningful audit and enforcement tools, and is operated by an independent, non-profit third-party *(see* Teller Decl. (Dkt. # 53) Ex. 2 at 1, 2–4 § B), might serve "to dissipate the possibility of consumer confusion or deception." *See, e.g., Zauderer,* 471 U.S. at 651, 105 S.Ct. 2265; *see also*

While consumer deception was at issue in *Zauderer*, the rule has not been limited to those facts, and Plaintiffs have articulated no sound basis for doing so. *See, e.g., Envtl. Def. Ctr., Inc. v. United States E.P.A.*, 344 F.3d 832, 849 (9th Cir.2003) (finding statute that required certain sewer providers to educate the public about the hazards of improper waste disposal constitutional where the purpose of the provision is legitimate and consistent with the regulatory goals of the Clean Water Act); *N.Y. State Rest. Ass'n v. N.Y. City Bd. of Health*, 556 F.3d 114, 133 (2d Cir. 2009) ("... *Zauderer's* holding was broad enough to encompass nonmisleading disclosure requirements."); *Pharm. Care. Mgmt. Ass'n v. Rowe*, 429 F.3d 294, 310 n. 8 (1st Cir.2005) ("[Plaintiff] states that the holding in *Zauderer* is limited to potentially deceptive advertising directed at consumers.... [W]e have found no cases limiting *Zauderer* in such a way.") (internal quotations omitted); *Nat'l Elec. Mfrs.*

*Ass'n v. Sorrell*, 272 F.3d 104, 115 (2d Cir.2001) (finding state labeling law requiring manufacturers of mercury containing products to disclose information about product disposal was governed by reasonable relationship rule of *Zauderer*).[10] As the Supreme Court has stated, "[b]ecause the extension of First Amendment protection to commercial speech is justified principally by the value to consumers of the information such speech provides, ... [Plaintiffs'] constitutionally protected interest in *not* providing any particular factual information ... is minimal." *Zauderer*, 471 U.S. at 651, 105 S.Ct. 2265 (italics in original; citation omitted).[11]

The City's required message includes only "purely factual and uncontroversial information" because it simply informs residents about the availability and process of the City's opt-out program. (Second Lilly Decl. (Dkt. # 55) Ex. 5.) Indeed, the required message makes no mention of the value or the necessity of recycling yellow

Milavetz, Gallop & Milavetz, P.A. v. United States, —— U.S. ——, 130 S.Ct. 1324, 1340, 176 L.Ed.2d 79 (2010) ("Evidence in the ... record demonstrating a pattern of advertisements that hold out the promise of debt relief without alerting customers to its potential costs, ... is adequate to establish that the likelihood of deception in this case is hardly a speculative one.") (internal quotations and citations omitted). Nevertheless, because the City has not asserted this interest as a justification for its regulation, the court has not factored it in its analysis.

**10.** The Ninth Circuit has cited *Nat'l Elec. Mfrs. Ass'n* with approval. *See Video Software Dealers Ass'n*, 556 F.3d at 966 (9th Cir.2009); *Envtl. Def. Ctr.*, 344 F.3d at 851 n. 27.

**11.** Some courts have suggested that the appropriate level of scrutiny is the intermediate test found in *Central Hudson*. *See, e.g., Borgner v. Brooks*, 284 F.3d 1204, 1210–13 (11th Cir.2002); *Mason v. Florida Bar*, 208 F.3d 952, 954–55 (11th Cir.2000); *but see Int'l Dairy Foods Assoc. v. Boggs*, 622 F.3d 628, 641–42 (6th Cir.2010) ("[I]n neither case did the Eleventh Circuit explain its decision to

employ the *Central Hudson* test instead of *Zauderer*."). While this court believes that *Zauderer* provides the correct standard, the City's required message would pass the *Central Hudson* test as well. The required message certainly advances the City's substantial interests in citizen privacy and waste reduction by disseminating information concerning the City's opt-out program in an effective manner. In addition, there is a "reasonable fit" between the City's ends and its means with regard to the required message. Publicizing information about the opt-out registry only on the City's website or in mailings would not be as effective as also supplying the information to residents on the very yellow pages directories at issue. (*See* First Lilly Decl. (Dkt. # 31) ¶ 13 ("... [P]rovid[ing] public service information to Seattle residents on the covers of yellow pages and on the publishers' websites ... is the single, most effective way for Seattle residents to be advised of the mechanism to use if they wish to stop the delivery of yellow pages to their homes or businesses.").)

pages. (*Id.*) The message furthers the City's interest both in reducing waste and maintaining resident privacy because it notifies residents about the availability of the opt-out program. Thus, because the required message about the City's opt-out registry is factual in nature and because it is consistent with the City's regulatory goals and the overall scheme of the Ordinance, the required message does not offend the First Amendment. Having now concluded all of the various elements of its analysis of Plaintiffs' First Amendment claim, the court finds that there is no genuine issue of material fact with regard to the parties' cross-motions for summary judgment on this claim, and that the Ordinance satisfies the First Amendment.

### E. The Ordinance Does Not Violate the Dormant Commerce Clause

■ The Commerce Clause provides that "[t]he Congress shall have Power ... [t]o regulate Commerce ... among the several States." U.S. Const. Art. I, § 8, cl. 3. The Commerce Clause as written is an affirmative grant of power to Congress to regulate interstate commerce, but from it courts have long inferred a prohibition on state action limiting interstate commerce. *Or. Waste Sys., Inc. v. Dep't of Envtl. Quality,* 511 U.S. 93, 98, 114 S.Ct. 1345, 128 L.Ed.2d 13 (1994). The "central rationale" to this inference, commonly referred to as the dormant Commerce Clause, is to prohibit state or local laws whose object is local economic protectionism. *Nat'l Ass'n of Optometrists & Opticians LensCrafters, Inc. v. Brown,* 567 F.3d 521, 523 (9th Cir.2009); *S.D. Myers, Inc. v. City & Cnty. of S.F.,* 253 F.3d 461, 466 (9th Cir.2001).

Plaintiffs assert that the City designed the Ordinance to avoid regulating local directory publishing organizations by adding a definition of "distribution" which included only "the unsolicited delivery of more than four tons annually of yellow pages phone books" within the City, and which exempted "the delivery of yellow pages phone books by membership organizations to their members" or others "requesting or expressly accepting delivery." SMC 6.255.025(B). Plaintiffs assert that this exception is discriminatory and that the City designed it to ensure that local Chamber of Commerce business directories would not be subject to the Ordinance. (Mot. at 5, 24–29.)

■ To determine whether the dormant Commerce Clause is applicable, the court must first determine if the Ordinance "regulate[s] an activity that 'has a substantial effect of interstate commerce such that Congress could regulate the activity.'" *LensCrafters, Inc. v. Brown,* 567 F.3d at 524 (quoting *Conservation Force, Inc. v. Manning,* 301 F.3d 985, 993 (9th Cir.2002)). Here, both Plaintiffs and the City appear to have assumed this to be so, and the court also concludes that dormant Commerce Clause applies because the publication and delivery of yellow pages phone directories involves and affects interstate commerce such that Congress could regulate in the area.

■ Once the court determines that the dormant Commerce Clause applies, the next step is to determine whether the challenged ordinance discriminates against out-of-state entities. *LensCrafters,* 567 F.3d at 524. "Laws that discriminate against out-of-state entities are subject to strict scrutiny, while non-discriminatory laws only need to satisfy a less rigorous balancing test to survive constitutional scrutiny." *Id.* at 524–25. The Ninth Circuit has also described its two-tiered approach when reviewing dormant Commerce Clause challenges as follows:

[1] When a state statute directly regulates or discriminates against interstate commerce, or when its effect is to favor in-state economic interests over out-of-state interests, we have generally struck

down the statute without further inquiry. [2] When, however, a statute has only indirect effects on interstate commerce and regulates evenhandedly, we have examined whether the State's interest is legitimate and whether the burden on interstate commerce clearly exceeds the local benefits.

*S.D. Myers,* 253 F.3d at 466.

 The party challenging the statute bears the burden of showing discrimination, *Hughes v. Oklahoma,* 441 U.S. 322, 336, 99 S.Ct. 1727, 60 L.Ed.2d 250 (1979), and to take advantage of the heightened scrutiny offered under the first approach, "[p]laintiffs must offer substantial evidence of an actual discriminatory effect." *Black Star Farms LLC v. Oliver,* 600 F.3d 1225, 1233 (9th Cir.2010) (quotation marks and citation omitted).

### 1. The Ordinance Does Not Discriminate Against Interstate Commerce

 A statute or regulation, such as the Ordinance at issue here, can discriminate against out-of-state interests (1) facially, (2) in practical effect, or (3) purposefully. *LensCrafters,* 567 F.3d at 525. First, Plaintiffs do not assert that the Ordinance is facially discriminatory, and the court finds that it is not. The explicit terms of the Ordinance do not distinguish between distributors located in Seattle and those located elsewhere. Indeed, the Ordinance requires an annual license "regardless of where publication takes place or the location of the business's offices, storage or transshipment facilities." SMC 6.255.030. It applies to any "person or organization engaged in the business of arranging for the distribution of yellow pages phone books in the City." SMC 6.255.025. Further, the specific exemptions about which Plaintiffs complain (for companies that distribute less than four tons of directories annually and for membership organizations) do not facially discriminate between local and out-of-state entities. The exemptions, on their face, apply equally to organizations irrespective of locale.

 Second, the Ordinance does not discriminate against interstate commerce in practical effect. The "critical inquiry" in determining whether a regulation directly regulates or discriminates against interstate commerce, is to look at the regulation's practical effect. *S.D. Myers,* 253 F.3d at 467. To determine whether a regulation has a practical discriminatory effect, the court must compare the allegedly burdened out-of-state entities with similarly situated in-state entities. *Black Star Farms,* 600 F.3d at 1230; *LensCrafters,* 567 F.3d at 525.

 Plaintiffs contend that they are similarly situated to exempt membership organizations, such as the Greater Seattle Business Association ("GSBA"), and contend that this exemption effectively favors local publishers over out-of-state publishers. (Mot. at 25.) Despite the fact that Plaintiffs must supply "substantial evidence of discriminatory effect," *Black Star Farms,* 600 F.3d at 1231, the only evidence Plaintiffs offer to support their contention that they are similarly situated to the exempt membership organizations is testimony by the President of YPA that "[y]ellow pages publishers compete for advertisers with other media, including ... the local exempt directories." (Norton Decl. ¶ 18; *see* Mot. at 25.) As *LensCrafters* makes clear, however, "competing in the same market is not sufficient to conclude that entities are similarly situated." 567 F.3d at 527.

In *LensCrafters,* opticians challenged a California law which prevented them from offering services in the same locations as licensed optometrists and ophthalmologists. 567 F.3d at 522. Plaintiffs argued that the law violated the dormant Com-

merce Clause and impermissibly burdened interstate commerce because optometrists and ophthalmologists, who were largely local individuals and entities, could set up a practice offering one-stop shopping where patients could get an eye examination and also buy prescription eyewear, but opticians, who were largely out-of-state practitioners, were prohibited from offering this convenience. *Id.* Like Plaintiffs here, the *LensCrafters* plaintiffs argued that the law constituted economic protectionism because opticians compete with optometrists and ophthalmologists in the eyewear market. *Id.* at 527. The court rejected this argument, however. Relying on *Exxon Corp. v. Governor of Maryland,* 437 U.S. 117, 125–27, 98 S.Ct. 2207, 57 L.Ed.2d 91 (1978), the *LensCrafters* court noted that a state may legitimately distinguish between entities based on their business structures, and that an "entity's structure is a material characteristic for determining if entities are similarly situated." *LensCrafters,* 567 F.3d at 527. Ultimately, the court held:

> Because they have different responsibilities, different purposes, and different business structures, opticians are not the same as optometrists or ophthalmologists. Although LensCrafters competes in the same market as in-state optometrists and ophthalmologists, LensCrafters is an optician. As such, it is similarly situated to in-state opticians, not in-state optometrists or ophthalmologists. Because the California laws make no geographical distinction between similarly situated entities, they are not invalidated by the dormant Commerce Clause.

*Id.* at 527–28.

Just as opticians were not similarly situated with ophthalmologists and optometrists in *LensCrafters,* Plaintiffs are not similarly situated with membership organizations. Membership organizations serve different constituencies than yellow page distributors. Membership organizations serve a self-selected interested group of members, while Plaintiffs distribute to a much broader group of residents, none of whom have expressly chosen to receive yellow pages directories. The Ordinance treats all distributors of yellow pages directories the same (regardless of whether they are located within Washington or not), and it treats all membership organizations the same (also regardless of whether they are located within Washington or not). The City, therefore, had the right to distinguish between these groups based on their different purposes and structures. *Id.* at 527. Because the ordinance "make[s] no geographical distinction between similarly situated entities, [it is] not invalidated by the dormant Commerce Clause." *Id.* at 527–28.

 Plaintiffs also contend that the Ordinance's exemption for any entity distributing less "than four tons annually of yellow pages," SMC 6.255.025(B), also discriminates in practical effect against interstate commerce. (Pls. Reply at 14.) The only evidence Plaintiffs' cite in this regard is an email from a City administrator who appears to be suggesting an exemption to the Ordinance for publishers of yellow pages directories which distribute less than four or five tons annually. (Mullins Decl. (Dkt. # 17) Ex. H; *see* Pls. Reply at 14.) The administrator suggests that such an exemption would cover nine local community Chamber of Commerce business directories, all of which are apparently published by one entity.[12] (Mullins Decl.

---

12. Plaintiffs' briefing implies that all local organizations or publishers fall within the confines of the Ordinance's exemptions (*see* Mot. at 26; Pls. Reply at 14), but the court could find no support for this conclusion in the record. Likewise, the court found no evidence in the record that the exemptions did not apply to any out-of-state publishers.

Ex. H.) This evidence is insufficient to meet the heavy burden placed on Plaintiffs to "offer substantial evidence of an actual discriminatory effect." *Black Star Farms,* 600 F.3d at 1233.

In *Black Star Farms,* the Ninth Circuit was considering a dormant Commerce Clause challenge to a small winery exception to Arizona's three-tiered alcohol beverage distribution system. The district court conceded that "more out-of-state wineries than in-state wineries are required to adhere to Arizona's three-tiered distribution system." *Id.* at 1233. Nevertheless, this fact alone was insufficient to establish that Arizona's small winery exception was discriminatory in effect against interstate commerce. *Id.* The Ninth Circuit cited with approval the district court's rationale that such evidence did not support the conclusion that the small winery exception created a market under which local goods constituted a larger share, and goods with an out-of-state source constituted a smaller share, of the total sales in the market. *Id.* The district court concluded that, at best, such evidence supports the contention that the statutory scheme places an incidental burden on interstate commerce. *Id.* If the court had found otherwise, "then no distinction would exist between statutes that are patently discriminatory in effect and those that are subject to the incidental burden test under [the second tier of the dormant Commerce Clause] analysis." *Id.* (quoting with approval *Black Star Farms, LLC v. Oliver,* 544 F.Supp.2d 913, 928 (D.Ariz.2008)). Accordingly, the Ninth Circuit affirmed the district court's order denying summary judgment to the plaintiffs and granting the state's cross-motion. *Id.* at 1233, 1235.

Here too, construing the evidence most favorably to Plaintiffs, Plaintiffs have merely demonstrated that the small tonnage exemption applies to several local organizations. Indeed, the email Plaintiffs rely upon cites nine. (Mullins Decl. Ex. H.) However, the fact that the small tonnage exemption may apply to more local than out-of-state entities does not establish that the exemption is discriminatory in effect against interstate commerce. *Id.* at 1233. Plaintiffs have offered no evidence that that the exemption creates a market under which local publishers are able to obtain a greater share of the advertising market and out-of-state publishers a smaller share. *Id.*

Finally, Plaintiffs contend that the Ordinance has a discriminatory purpose because the exemptions for membership organizations and small tonnage were in reality adopted to intentionally exclude local business directories in King and Snohomish counties. (Mot. at 25; Pls. Reply at 14.) The words of the legislative body itself, written contemporaneously with the passage of the law in question, are usually the most authoritative guide to legislative purpose. *See, e.g., Minnesota v. Clover Leaf Creamery Co.,* 449 U.S. 456, 463 n. 7, 471 n. 15, 101 S.Ct. 715, 66 L.Ed.2d 659 (1981) ("... [T]his Court will assume that the objectives articulated by the legislature are actual purposes of the statute, unless examination of the circumstances forces us to conclude that they "could not have been a goal of the legislation." "). Here, the Ordinance itself identifies three purposes that motivated the City Council: waste reduction, protection of residents' privacy from unwanted intrusions, and the recovery of costs incurred to maintain and enforce the opt-out registry. (Mullins Decl. Ex. A, Preamble.)

The evidence Plaintiffs present to the contrary, even construed in a light most favorable to them, is scant at best. For example, Plaintiffs have submitted an email string consisting of three messages that occurred prior to the passage of the

Ordinance. The email string involves various City Council members and a local lobbying interest and discusses proposed amendments to the Ordinance. (*Id.* Ex. G.) While the emails indicate an interest in exempting membership and non-profit organizations, and "in crafting language that will effectively meet the intent of the ordinance and withstand constitutional scrutiny," nothing in these emails expressly indicates an interest in impermissibly discriminating in favor of local interests or against out-of-state interests. (*Id.*)

In addition, as already noted above, Plaintiffs also point to email correspondence from a City administrator which suggests an exemption to the Ordinance for publishers who distribute less than four or five tons of directories per year. (*Id.* Ex. H.) While it is apparent from the administrator's email that the proposed exemption would apply to nine local Chamber of Commerce business directories, nothing in the email expresses a purpose to discriminate against out-of-state interests (*id.*), and in fact the exemption applies to all small tonnage distributors irrespective of locale.

Plaintiffs also assert that the fact that the Ordinance was amended to exempt membership organizations and small tonnage distributors, after local organizations sought these or similar revisions, demonstrates a purpose to impermissibly discriminate against out-of-state economic interests. (Mot. at 25; Pls. Reply at 14.) The court, however, can find no such evidence in the record cited by Plaintiffs. In fact, one of the emails from a lobbyist expressly references the potential negative impact on nonprofit organizations "throughout the City and *region.*" (Mullins Decl. Ex. G (emphasis added).)

 Even if comments by the lobbyists and the City administrator could be construed to indicate some impermissible motivation, such isolated and stray state- ments would be insufficient to override the City Council's formal statements of purpose in the Ordinance itself. The court's review of the record indicates that the City Council heard extensive testimony during at least six hearings occurring over four months in which residents provided detailed testimony regarding their concerns about the waste generated by yellow pages directories, the invasion of their privacy, and their frustration at receiving yellow pages directories on their doorsteps despite their attempts to opt-out on Plaintiffs' opt-out systems. (Rasmussen Decl. ¶ 4; *see also* O'Brien Decl. ¶ 4.) This substantial evidence is consistent with the City Council's formal statements of purpose within the Ordinance itself. In this context, stray and isolated comments by lobbyists and City administrators, even if they articulate an impermissible interest in discriminating against interstate commerce, will not serve to invalidate a law under the dormant Commerce Clause. *See Maine v. Taylor,* 477 U.S. 131, 150–51, 106 S.Ct. 2440, 91 L.Ed.2d 110 (1986) (plaintiff's evidence, including statement by state administrator indicating protectionist motivation for challenged law, would not establish violation of dormant Commerce Clause where evidence did not demonstrate that the state had no legitimate interest in enacting the challenged law); *Allstate Ins. Co. v. Abbott,* 495 F.3d 151, 161 (5th Cir.2007) (stray protectionist remarks of certain legislators were insufficient to condemn statute under the dormant Commerce Clause where overall legislative record revealed legitimate, nondiscriminatory purposes). Thus, the court finds that because the Ordinance is not facially discriminatory, and because it does not directly regulate or discriminate against interstate commerce in practical effect or purpose, the Ordinance is not subject to strict scrutiny under the Commerce Clause.

## 2. The Local Benefits Outweigh any Burden Imposed on Interstate Commerce

When a regulation is non-discriminatory and has only incidental or indirect effects on interstate commerce, the regulation is analyzed under the second tier of the dormant Commerce Clause. *S.D. Myers,* 253 F.3d at 466. These regulations are valid unless the burden imposed on interstate commerce is clearly excessive in relation to the local benefits. *Id.; see also Alaska Airlines, Inc. v. City of Long Beach,* 951 F.2d 977, 983 (9th Cir.1991) ("For a facially neutral statute to violate the Commerce Clause, the burdens of the statute must so outweigh the putative benefits as to make the statute unreasonable or irrational."). The party challenging the regulation bears the burden of proof on this issue. *LensCrafters,* 567 F.3d at 528. Under this rational basis test, the City is not required "to convince the courts of the correctness of their legislative judgments." *Spoklie v. Montana,* 411 F.3d 1051, 1059 (9th Cir.2005) (quoting *Clover Leaf Creamery Co.,* 449 U.S. at 464, 101 S.Ct. 715). Instead, Plaintiffs "must convince the court that the legislative facts on which the classification is apparently based could not reasonably be conceived to be true by the governmental decisionmaker." *Id.*

Here, the court finds that the Ordinance passes the rational basis test. The court first notes that the interests the Ordinance advances are legitimate. (*See supra* at 1225–26.) Plaintiffs advance several reasons, however, for why the burdens imposed by the Ordinance are clearly excessive in relation to the local benefits. First, Plaintiffs argue that any benefit obtained by the Ordinance is minimal because yellow pages publishers already have an opt-out system that many Seattle residents currently use. (Mot. at 27.) Under the rational basis test, however, courts do not "second guess the empirical judgments of lawmakers concerning the utility of legislation." *CTS Corp. v. Dynamics Corp. of Am.,* 481 U.S. 69, 92, 107 S.Ct. 1637, 95 L.Ed.2d 67 (1987); *see also Valley Bank of Nev. v. Plus Sys., Inc.,* 914 F.2d 1186, 1197 (9th Cir.1990) ("Unwise legislation does not constitute a commerce clause violation."); *Spoklie,* 411 F.3d at 1059. Although Plaintiffs believe their opt-out system is sufficient, this does not make the City's judgment irrational and unconstitutional.[13]

Second, Plaintiffs claim that these meager benefits are outweighed by the financial burdens Plaintiffs will suffer if the Ordinance remains in effect. (Mot. at 27–28.) The Commerce Clause protects the interstate market, however, not individual companies from prohibitive or burdensome regulations. *Exxon Corp. v. Governor of Md.,* 437 U.S. 117, 126–128, 98 S.Ct. 2207, 57 L.Ed.2d 91 (1978) ("The fact that the burden of a state regulation falls on some interstate companies does not, by itself, establish a claim of discrimination against interstate commerce."). Thus, the fact that Plaintiffs may be financially burdened does not demonstrate that there is a burden on interstate commerce.

13. In any event, the City's opt-out system appears to be wildly more popular among City residents than Plaintiffs' opt-out systems. According to Plaintiffs, as of November 29, 2010, approximately 17,000 people had opted out of delivery of Dex's Seattle yellow pages using Dex's opt-out system. (Stonecipher Decl. ¶ 10.) On the other hand, between May 5 and May 13, 2011, Seattle residents had utilized the City's opt-out system to opt-out of the delivery of 136,651 yellow pages directories, averaging over 17,000 new opt-outs per day. (Second Teller Decl. ¶ 2.)

Finally, Plaintiffs claim that there will be a significant burden on interstate commerce if other cities enact similar legislation. (Mot. at 28–29.) It is insufficient for Plaintiffs to speculate about the possibility of conflicting legislation. *S.D. Myers*, 253 F.3d at 470. Plaintiffs' reliance on statements made by the Ordinance's sponsor encouraging other jurisdictions to adopt similar legislation falls short of the requirement that Plaintiffs must produce evidence that conflicting legislation is already in place or that the threat of legislation is actual and pending. *Id.* at 470–71. Regardless of the fact that it might increase Plaintiffs' financial costs, it would be constitutional for other cities to enact similar legislation. *See Exxon Corp.*, 437 U.S. at 127–28, 98 S.Ct. 2207. Despite the concerns raised by Plaintiffs, any burden imposed on interstate commerce does not clearly outweigh its legitimate benefits. Thus, the court finds that the Ordinance satisfies the dormant Commerce Clause.

## IV. CONCLUSION

For the reasons stated above, the court DENIES Plaintiffs' motion for partial summary judgment (Dkt. # 14) and GRANTS the City's cross-motion for partial summary judgment (Dkt. # 28) with regard to Plaintiffs' claims under the First Amendment and the Commerce Clause.