**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

DEX MEDIA WEST, INC.;
SUPERMEDIA LLC; YELLOW PAGES
INTEGRATED MEDIA ASSOCIATION,
DBA Yellow Pages Association,
            *Plaintiffs-Appellants,*

            v.

CITY OF SEATTLE; RAY HOFFMAN, in
his official capacity as Director of
Seattle Public Utilities,
            *Defendants-Appellees.*

No. 11-35399

D.C. No.
2:10-cv-01857-JLR

DEX MEDIA WEST, INC.;
SUPERMEDIA LLC; YELLOW PAGES
INTEGRATED MEDIA ASSOCIATION,
DBA Yellow Pages Association,
            *Plaintiffs-Appellants,*

            v.

CITY OF SEATTLE; RAY HOFFMAN, in
his official capacity as Director of
Seattle Public Utilities,
            *Defendants-Appellees.*

No. 11-35787

D.C. No.
2:10-cv-01857-JLR

OPINION

Appeal from the United States District Court
for the Western District of Washington
James L. Robart, District Judge, Presiding

Argued and Submitted
February 9, 2012—Pasadena, California

Filed October 15, 2012

12313

Before: Richard R. Clifton and N. Randy Smith,
Circuit Judges, and Edward R. Korman,
Senior District Judge.*

Opinion by Judge Clifton

---

*The Honorable Edward R. Korman, Senior District Judge for the U.S.
District Court for the Eastern District of New York, sitting by designation.

---

**COUNSEL**

David J. Burman (argued), Kathleen M. O'Sullivan, and Noah G. Purcell, Perkins Coie LLP, Seattle, Washington, for the plaintiffs-appellants.

Jessica L. Goldman (argued), Summit Law Group PLLC, Seattle, Washington, William Foster and Gregory Narver, Seattle City Attorney's Office, Seattle, Washington, for the defendants-appellees.

---

**OPINION**

CLIFTON, Circuit Judge:

The "yellow pages" telephone directory was once a ubiquitous part of American life, found in virtually every household and office. We were regularly encouraged to let our fingers do the walking. But times have changed, and today phone books, like land-line telephones themselves, are not so universally accepted.

The City of Seattle imposes substantial conditions and costs on the distribution of yellow pages phone directories. Ordi-

nance 123427, adopted in 2010, requires publishers of yellow pages directories to obtain permits and pay a fee for each directory distributed in the city. It also establishes an opt-out registry, through which residents can decline to receive directories. The publishers are required by the Ordinance to advertise the availability of the opt-out registry on the front covers of their directories. The fees paid by the publishers are intended to cover the cost of operating and promoting the opt-out registry.

Plaintiffs Dex Media West, Inc., SuperMedia LLC, and the Yellow Pages Integrated Media Association (the "Yellow Pages Companies") challenged the validity of the Ordinance. The challenge is based primarily on the First Amendment of the United States Constitution, but the plaintiffs also present arguments based on the Commerce Clause of the Constitution and on the Washington State Constitution and statutes.

The district court rejected the plaintiffs' challenge and granted summary judgment in favor of the defendants, allowing the Ordinance to stand. The district court reasoned that the directories represented "commercial speech," which benefits from less protection under the First Amendment. The plaintiffs appeal.

We conclude that the yellow pages directories qualify for full protection under the First Amendment. Although portions of the directories are obviously commercial in nature, the books contain more than that, and we conclude that the directories are entitled to the full protection of the First Amendment. As a result, when we evaluate the Ordinance under strict scrutiny, it does not survive. Accordingly, we reverse the district court's entry of summary judgment in favor of the defendants and remand for the entry of judgment in favor of the plaintiffs.

## I.   Factual Background

### A.   *Yellow Pages*

The State of Washington requires telephone companies ("local exchange carriers" or "LECs") to publish and distribute residential listings, business listings, and certain consumer information for each customer in the local exchange. Wash. Admin. Code § 480-120-251. Local telephone companies often contract with publishers to satisfy this requirement by producing yellow pages directories.

The contents of phone books generally fall into three categories: (1) business "white pages" sections, which provide names, addresses, and phone numbers of local businesses and professionals in alphabetical order; (2) traditional yellow pages, which list businesses by category of product or service; and (3) public interest material, which includes community information, maps, and government listings. In large cities, the directories are sometimes divided into multiple volumes.

Paid advertising is mixed in with the listings. It typically constitutes less than half of the content in the yellow pages. For example, the 2010 Dex Seattle Metro business directory contained 1,344 pages. Of those, 96 were community pages, 404 were business "white pages," and 844 were business "yellow pages." Display advertising comprised about 35% of the 2010 Dex Seattle Metro yellow pages.

Users consult phone books for a number of reasons, including finding business, government, and personal telephone numbers and addresses, identifying businesses that provide a desired service or good, comparing goods and services available from multiple sellers, and learning about local telephone service and the community. Customers receive the directories free of charge.

The City estimates that yellow pages generate 1300 tons of waste each year, costing the municipality $190,000 annually.

## B. Ordinance 123427

Between June and October 2010, the City Council heard testimony from residents who were frustrated with the delivery of unwanted yellow pages to their homes. Dex and Super-Media offered their own opt-out programs that they contended had low error rates, but numerous residents asserted that their requests to opt out through the private systems went unheeded. Those residents complained that the unwanted deliveries violated their right to privacy and generated large amounts of waste.

In response, in October 2010, the City enacted Ordinance 123427, which bans the distribution of "yellow pages phone books" in Seattle unless telephone book publishers meet certain conditions. Seattle Mun. Code § 6.255 (2010); *see also* Seattle Ordinance 123427 (Oct. 14, 2010) (Preamble) (describing the three purposes motivating the City to enact the Ordinance: waste reduction, protection of residents' privacy from unwanted intrusions, and recovery of costs incurred to maintain and enforce the opt-out registry).

The Ordinance created an "Opt-Out Registry . . . for residents and businesses to register and indicate their desire not to receive delivery of some or all yellow pages phone books." Seattle Mun. Code § 6.255.090(A). A publisher who fails to comply with any part of the Ordinance may be fined or lose its license. *Id.* §§ 6.255.130, .140.

Under the Ordinance, phone book publishers must "obtain[ ] an annual yellow pages phone book distributor license[,] . . . separate from and in addition to . . . the business license required pursuant to chapter 5.55." *Id.* § 6.255.030. To obtain the license, a publisher must pay a fee and provide information specified by the Director of Seattle Public Utilities. *Id.* §§ 6.255.060, .080(B). Publishers must also pay the City fourteen cents for "each yellow pages phone book distributed within the City." *Id.* § 6.255.100(A). Publishers must

"prominently and conspicuously display on . . . the front cover of each yellow pages phone book distributed within the City" and "on their websites" a message mandated by the City about the City's program for opting out of receiving phone books. *Id.* § 6.255.110. The rule implementing the Ordinance requires that no less than three square inches of cover space and twelve square inches inside the books must be devoted to informing recipients of the City's opt-out registry.

The Ordinance exempts some publications from its coverage. "Distribution" is defined to exclude delivery of directories by membership organizations to members or others requesting delivery. *Id.* § 6.255.025(B). In addition, LECs who distribute only those phone books required by Washington Administrative Code § 480-120-251 need not comply with the requirements, meaning that books with residential and business listings but no "yellow pages" advertising are not covered by the Ordinance. Seattle Mun. Code § 6.255.035.

## II.   Procedural History

On November 15, 2010, the Yellow Pages Companies filed a complaint in district court against the City of Seattle challenging the Ordinance as unconstitutional. The plaintiffs moved for summary judgment, and, in the interim, filed a motion for a preliminary injunction on First Amendment and Commerce Clause grounds. On May 8, 2011, the district court denied the motion for preliminary injunction. *Dex Media West, Inc. v. City of Seattle*, No. 2:10-cv-01857-JLR, 2011 WL 1869330 (W.D. Wash. May 16, 2011). The plaintiffs appealed the denial of a preliminary injunction, and argument was held on an expedited basis before this panel on July 13, 2011.

Shortly before the argument date, on June 28, 2011, the district court granted summary judgment in favor of the City on the Yellow Pages Companies' claims under the First Amendment and the Commerce Clause. *Dex Media West, Inc. v. City*

*of Seattle*, 793 F. Supp. 2d 1213, 1218-19 (W.D. Wash. 2011). First, the district court held that yellow pages phone books are commercial speech entitled to intermediate scrutiny under the First Amendment. *Id.* at 1221-23. The district court considered the three factors outlined in *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 65 (1983) — an advertising format, reference to a specific product, and economic motivation for publication — and concluded that these factors, as well as common sense, led to a conclusion of commercial speech. *Dex Media*, 793 F. Supp. 2d at 1221-23.

The district court also concluded that the commercial speech was not inextricably intertwined with noncommercial speech. Citing *Riley v. National Federation of the Blind of North Carolina*, 487 U.S. 781 (1988), and *Board of Trustees of State University of New York v. Fox*, 492 U.S. 469 (1989), the court found that "nothing in the City's Ordinance nor in the nature of these directories requires that their noncommercial aspects, such as maps, listings, and street guides, be combined with advertising." *Dex Media*, 793 F. Supp. 2d at 1223-24. The court dismissed any likening to newspapers as "a stretch too far for this court," as "newspapers have played an historic role in our democracy as conveyers of individual ideas and opinions." *Id.* at 1225 (internal quotations omitted). Therefore, the publication of noncommercial speech alongside commercial speech did not entitle the yellow pages phone books to full First Amendment protection.

The district court next evaluated the Ordinance under the test for intermediate scrutiny outlined in *Central Hudson Gas & Electric Corp. v. Public Service Commission of New York*, 447 U.S. 557, 566 (1980). The court held that the Ordinance survived scrutiny under *Central Hudson* because (1) the speech concerns lawful activity that is not misleading; (2) the government has a substantial interest in waste reduction, resident privacy, and cost recovery; and (3) the City showed a reasonable fit between its means and ends. *Dex Media*, 793 F. Supp. 2d at 1226-30. The court concluded that Ordinance pro-

vided "more than ineffective or remote support" for the City's interests. *Id.* at 1227. The district court noted that the City considered opt-out legislation in response to specific resident complaints, and that the City did not have to legislate so as to wholly eliminate a problem it identified. *Id.* at 1229. The district court also held that the Ordinance did not violate the Commerce Clause. *Id.* at 1232-35.

At oral argument before this panel on July 13, 2011, and in supplemental submissions filed at the court's request thereafter, the parties discussed the impact of the district court's order and the likelihood that the district court would soon enter a final judgment, effectively mooting the appeal of the preliminary injunction denial.

On September 16, 2011, the district court granted summary judgment in favor of the City on the Yellow Pages Companies' remaining claims, which involved Washington state law. *Dex Media West, Inc. v. City of Seattle*, No. 2:10-cv-01857-JLR, 2011 WL 4352121 (W.D. Wash. Sept. 16, 2011). The district court entered a final judgment on that date, and the Yellow Pages Companies appealed from that judgment. Because the district court ruled on summary judgment before this court reached a decision on the preliminary injunction, and the Yellow Pages Companies also appealed the final judgment to this court, the appeals have been consolidated.[1]

## III.  Discussion

We review de novo the district court's ruling on summary judgment. *City of Los Angeles v. San Pedro Boat Works*, 635 F.3d 440, 446 (9th Cir. 2011).

___

[1]Because we now rule on the merits of the case, deciding the preliminary injunction appeal would have no practical consequences. *See Mt. Graham Red Squirrel v. Madigan*, 954 F.2d 1441, 1450 (9th Cir. 1992). Accordingly, we dismiss the appeal of the preliminary injunction as moot.

### A.   Yellow Pages Phone Books are Noncommercial Speech

The First Amendment affords protection to both commercial and noncommercial speech. *See Bigelow v. Virginia*, 421 U.S. 809, 818 (1975). The strength of that protection, however, depends on how that speech is classified. We evaluate content-based restrictions on noncommercial speech under strict scrutiny.[2] *See Berger v. City of Seattle*, 569 F.3d 1029, 1050 (9th Cir. 2009) (en banc). We analyze similar restrictions on commercial speech under a more lenient standard, as set forth in *Central Hudson Gas & Electric Corp. v. Public Service Commission of New York*, 447 U.S. 557, 566 (1980).

Neither party disputes that the Ordinance is a content-based restriction — it regulates only yellow pages directories. *See Berger*, 569 F.3d at 1051 ("A regulation is content-based if . . . , by its very terms, [it] singles out particular content for differential treatment."). We must determine, therefore, whether yellow pages phone books constitute commercial or noncommercial speech.

**[1]** It is readily apparent that many of the advertisements contained in yellow pages directories fit within our "core notion of commercial speech," meaning "speech which does 'no more than propose a commercial transaction.' " *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 66 (1983) (quoting *Va. Pharmacy Bd. v. Va. Consumer Council, Inc.*, 425 U.S. 748, 762 (1976)); *see also Hunt v. City of Los Angeles*, 638 F.3d 703, 715 (9th Cir. 2011).

**[2]** However, the Ordinance regulates a yellow pages

---

[2]Some content-based restrictions do not warrant strict scrutiny, if they regulate speech that "falls into one of the 'well-defined and narrowly limited classes of speech' that is unprotected by the First Amendment." *United States v. Alvarez*, 638 F.3d 666, 667 (9th Cir. 2011) (quoting *United States v. Stevens*, 130 S. Ct. 1577, 1584 (2010)). The speech at issue here does not fall into any of the unprotected categories.

phone book as a whole, not simply the individual advertisements contained therein. It is just as readily apparent that telephone listings and community information contained in the directory constitute noncommercial speech. *See City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 423 (1993) ("[I]t is clear that much of the material in ordinary newspapers is commercial speech and, conversely, that the editorial content in respondents' . . . publications is not what we have described as 'core' commercial speech."). Although some people now turn to the internet or other sources to find what they are looking for, many still turn to the phone book to find useful information. As noted above, the State of Washington requires phone companies to provide directories to their customers, demonstrating that the directories serve more than a commercial purpose.

Because the phone books contain components of both commercial and noncommercial speech, we must consider how they are to be evaluated by analyzing "the nature of the speech taken as a whole" to determine what level of First Amendment protection the yellow pages directories receive. *See Riley v. Nat'l Fed'n of the Blind of N.C.*, 487 U.S. 781, 796 (1988).

**[3]** When analyzing mixed-content publications, Supreme Court precedent seems to outline a two-step analysis for determining whether the publication deserves full First Amendment protection. First, courts must determine as a threshold matter if a publication as a whole constitutes commercial speech. This determination is made either (1) under the traditional test from *Virginia Pharmacy*, because the speech "does no more than propose a commercial transaction," 425 U.S. at 762; or, (2) in "close question[s]," because the publication reflects other characteristics, such as the factors identified by the Supreme Court in *Bolger*. *Hunt*, 638 F.3d at 715 (citing *Bolger*, 463 U.S. at 66-67). The factors identified in *Bolger* include "three characteristics which, in combination, support[ ]" a conclusion that the document "at

issue constitute[s] commercial speech, including (i) their advertising format, (ii) their reference to a specific product, and (iii) the underlying economic motive of the speaker." *Assoc. of Nat'l Advertisers, Inc. v. Lungren*, 44 F.3d 726, 728 (9th Cir. 1994). The Court made clear that these three factors are not dispositive, but the "combination of all these characteristics . . . provides strong support for the . . . conclusion that the [publication at issue is] properly characterized as commercial speech." *Bolger*, 463 U.S. at 67.

**[4]** Second, even if the publication meets this threshold commercial speech classification, courts must determine whether the speech still receives full First Amendment protection, because the commercial aspects of the speech are "inextricably intertwined" with otherwise fully protected speech, such that the publication sheds its commercial character and becomes fully protected speech. *See, e.g.*, *Riley*, 487 U.S. at 796. As the Court explained in *Riley*, speech that "in the abstract is indeed merely 'commercial' " does not "*retain*[ ] its commercial character when it is inextricably intertwined with otherwise fully protected speech." *Id.* at 796 (emphasis added) (internal quotation marks omitted). In other words, the inextricably intertwined test operates as a narrow exception to the general principle that speech meeting the *Bolger* factors will be treated as commercial speech.

The Supreme Court seemed to utilize this two-step analysis in *Riley* and *Board of Trustees of State University of New York v. Fox*, 492 U.S. 469 (1989). In *Riley*, the Court considered a North Carolina statute which restricted the charitable solicitation activities of professional fundraisers. The Court first noted that "[i]t is not clear that a professional's speech is necessarily commercial whenever it relates to that person's financial motivation for speaking." *Id.* at 795. It then assumed without deciding that the speech was "merely 'commercial' " as a whole. *Id.* at 796. Only after making that assumption did the Court analyze the speech under the "inextricably intertwined" test. *Id.* The Court's analysis in *Riley* makes clear that

the speech at issue must have already gained commercial character before an "inextricable intertwin[ing]" analysis is necessary to determine if the speech "retain[s] its commercial character;" to *retain* some character, speech must have held that character initially. *See id.*

Similarly, in *Fox*, the Court addressed the "first question" of whether the "principal type of expression at issue is commercial speech." *Fox*, 492 U.S. at 473-74. The regulation at issue prohibited the operation of commercial enterprises on state university grounds. *Id.* at 471-72. The university invoked the regulation in order to bar a company from selling housewares at a variant on a "Tupperware party" in a student dormitory. *Id.* at 472. In addition to pitching the company's products, the party host also discussed home economics topics. *Id.* at 473-74. The Court determined that there was "no doubt" that the houseware parties were held merely to "propose a commercial transaction." *Id.* at 473. The Court also noted that the home economics speech "link[ed] a product," specifically the housewares, to an expressive discussion. *Id.* at 475. After the Court decided that the speech (as a whole) was commercial in nature, the Court continued to an inextricably intertwined analysis. The Court explained that the commercial and expressive speech were not inextricably intertwined, because "[n]o law of man or of nature ma[de] it impossible to sell housewares without teaching home economics." *Id.* at 474. Thus, the Court determined that the expression was still "commercial speech" despite the inclusion of some protected speech. *Id.* at 475.

Our Circuit also appeared to utilize this two-step approach in *Hunt v. City of Los Angeles*, 638 F.3d 703, 715-16 (9th Cir. 2011). We first noted that the plaintiffs, boardwalk vendors, "clearly propose a commercial transaction," because "the core of [their] speech is directed to their products and why a consumer should buy them." *Id.* at 716. Only after making this determination did we further explain that "any noncommercial aspect of [their] speech is not inextricably intertwined

with commercial speech," because the plaintiffs "could easily sell their wares without reference to any religious, philosophical, and/or ideological element, and they could also express any noncommercial message without selling these wares." *Id.* Thus, we determined that the mixed-content speech at issue was commercial as a threshold matter, and it did not shed this commercial nature through inextricable intertwining.

**[5]** Under this analytical framework, we conclude that a yellow pages directory goes beyond the threshold classification of commercial speech. The yellow pages clearly do "more than propose a commercial transaction." *Virginia Pharmacy*, 425 U.S. at 762. Even assuming this mixed-content publication constitutes a "close question," a yellow pages directory, as a whole, does not fulfill two of the three Bolger factors. *Hunt*, 638 F.3d at 715. "Even the most cursory examination of the [yellow pages directory] reveals that it is not 'concededly an advertisement' and . . . it does not refer to a specific product." *U.S. Olympic Comm. v. Am. Media, Inc.*, 156 F. Supp. 2d 1200, 1207 (D. Colo. 2001) (citing *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 66, 68 (1983)).

**[6]** There is certainly no clear link between the yellow pages' noncommercial speech (community information and phone listings) and the yellow pages' commercial speech (a wide array of advertisements), nor does the noncommercial speech necessarily reference any of the products in these advertisements. This publication is "qualitatively different from an advertising leaflet put forth by an *individual merchant* to tout *only its own products* . . . ." *Ad World, Inc. v. Twp. of Doylestown*, 672 F.2d 1136, 1140 (3d Cir. 1982) (emphasis added). Moreover, "[t]here is no evidence that the editorial content is added as a mere sham to convert a pure advertising leaflet into noncommercial speech." *Id.* at 1139.

Indeed, paid display advertising makes up less than half of the content of a typical yellow pages directory.[3]

Further, the yellow pages are distinguishable from the advertising publications in *Bolger*, *Riley*, or *Fox* where non-commercial speech was referencing a product. *See Bolger*, 463 U.S. at 62-63 (where the discussion of family planning was clearly linked to the advertiser's promotion of contraceptives in the pamphlet); *Riley v. Nat'l Fed'n of the Blind of N.C.*, 487 U.S. 781, 795-96 (1988) (where the protected speech discussing a charity's mission was related to the charity's finances); *Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 474 (1989) (where the protected speech discussing home economics was related to the selling of housewares). This analysis is consistent with the consideration of policy underlying the distinction between the protections afforded commercial and noncommercial speech. *Bolger*, 463 U.S. at 65 (internal citation omitted) ("In light of the greater potential for deception or confusion in the context of certain advertising messages . . . content-based restrictions on commercial speech may be permissible.").

The yellow pages directories may only satisfy one *Bolger* factor: that the publisher has a commercial motive in publishing the directories. However, under *Bolger* and other Supreme Court precedent, economic motive in itself is insufficient to

---

[3]Furthermore, the ordinance here does not by "explicit terms . . . limit its restrictions to purely commercial speech. *S.O.C.*, *Inc. v. Cnty. of Clark*, 152 F.3d 1136, 1144 (9th Cir. 1998); *cf. Am. Academy of Pain Mngt. v. Joseph*, 353 F.3d 1099, 1106 (9th Cir. 2004) (finding that statute regulated only commercial speech under *Bolger* because it "identifies that the object of its regulation is 'advertising,' " and "[t]he advertising regulated relates to a specific product"); *Lungren*, 44 F.3d at 728 (finding that statute regulated only commercial speech under *Bolger* because "the statute regulates representations concerning a specific consumer good which take the form of advertisements or product labels" and "specifically requires that the representation be made about a specific consumer good which a firm manufactures or distributes").

characterize a publication as commercial, as will be discussed more fully below. *Bolger*, 463 U.S. at 67 ("[A]n economic motivation . . . would clearly be insufficient by itself to turn the materials [in question] into commercial speech."); *Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations*, 413 U.S. 376, 385 (1973) ("If a newspaper's profit motive were determinative, all aspects of its operations–from the selection of news stories to the choice of editorial position– would be subject to regulation if it could be established that they were conducted with a view toward increased sales."); *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495 (1952) ("That books, newspapers, and magazines are published and sold for profit does not prevent them from being a form of expression whose liberty is safeguarded by the First Amendment.").

The City would have us disregard the evaluation of the publication as a whole, arguing that mixed-content publications, or hybrid speech, can only receive full First Amendment protection if the commercial speech is "inextricably intertwined" with the other speech in the directories. However, such a rule is contradicted by many decisions concluding that various types of mixed-content speech were fully protected even without engaging in an inextricably intertwined analysis. *See Consol. Edison Co. v. Pub. Serv. Comm'n*, 447 U.S. 530 (1980) (concluding that a utility company's bill containing factual statements on matters such as the use of nuclear power was fully protected under the First Amendment because it concerned the 'arena of public discussion,' even though the statements could influence consumer's choices); *Gorran v. Atkins Nutritionals, Inc.*, 464 F. Supp. 2d 315 (S.D.N.Y. 2006) (holding that a book with some commercial references to products and services was not commercial speech), *aff'd*, 279 F. App'x 40 (2d Cir. 2008); *S.O.C., Inc. v. Cnty. of Clark*, 152 F.3d 1136, 1144 (9th Cir. 1998) (concluding, on a preliminary injunction review, that a publication with protected speech and commercial advertisements constituted "noncommercial expressive material" without expressly holding that this mixed-content was "inextricably inter-

twined"); *Commodity Trend Serv., Inc. v. Commodity Futures Trading Comm'n*, 149 F.3d 679 (7th Cir. 1998) ("A speaker's publication does not lose its status as protected speech simply because the speaker advertises the publication. . . . If the result were otherwise, then even an editorial in The New York Times would constitute commercial speech because the newspaper seeks subscribers through advertisements." (citation omitted)); *Sec. & Exch. Comm'n v. Wall St. Publ'g Inst.*, 851 F.2d 365, 372 (D.C. Cir. 1988) (holding that articles discussing, in part, a company's products did not constitute commercial speech under the *Bolger* factors because (1) the "articles [were] not 'conceded' to be advertisements, and in fact, are not in an advertisement format;" "they [were] indistinguishable from run-of-the-mill newspaper or magazine stories;" and they did not "prominent[ly]" reference company products); *Ad World, Inc. v. Twp. of Doylestown*, 672 F.2d 1136, 1139-40 (3d Cir. 1982) (concluding that a local tabloid containing extensive advertising and a few pages of consumer and community information was not commercial speech because it was "different from an advertising leaflet put forth by an individual merchant to tout only its own products" and the "publication as a whole" did not "relate[ ] solely to the economic interest of the speaker and its audience"); *U.S. Olympic Comm. v. Am. Media, Inc.*, 156 F. Supp. 2d 1200, 1207 (D. Colo. 2001) ("[c]onsidering the three-factor test applied in *Bolger*," the court determined that a magazine containing commercial and noncommercial speech did not constitute commercial speech, because it was not "concededly an advertisement and . . . it [did] not refer to a specific product").

The City's approach would render the commercial speech factors outlined in *Bolger* essentially irrelevant because courts would simply skip that test and immediately jump to an inextricably intertwining analysis any time mixed-content speech is at issue. The City's reasoning would also provide less protection for vital protected speech, by essentially presuming that any mixed-content speech is commercial unless the types of speech are inextricably intertwined. As Justice Stevens and

the D.C. Circuit have noted, "it is important that the commercial speech doctrine not be defined too broadly lest speech deserving of greater constitutional protection be inadvertently suppressed." *Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 579 (1980) (Justice Stevens, concurring); *Sec. & Exch. Comm'n v. Wall St. Publ'g Inst.*, 851 F.2d 365, 372 (D.C. Cir. 1988) (quoting that concurring opinion).

Finally, the City's proposed rule would require an unreasonable expansion of the Supreme Court's narrow inextricably intertwined exception—an exception intended to be applied *only* when a "law of man or of nature makes it *impossible*" to separate commercial and noncommercial aspects of speech. *Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 474 (1989) (emphasis added). It surely cannot be the case that newspapers (or any other clearly expressive, mixed-content speech such as magazines or televised political debates that are interspersed with commercials) can only qualify for full First Amendment protection if the advertisements in newspapers are required by a "law of man or of nature" to be intertwined with the daily headlines. *See City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 423 (1993) ("[I]t is clear that much of the material in ordinary newspapers is commercial speech and, conversely, that the editorial content in respondents' . . . publications is not what we have described as 'core' commercial speech.").

Contrary to the City's view, publications like yellow pages directories and newspapers receive full First Amendment protection not only because their content is somehow inextricably intertwined, but because, as a threshold matter, they do not constitute commercial speech under the tests of *Virginia Pharmacy* and *Bolger*.

[7] Moreover, even if we were to adopt the City's view, when we apply the inextricably intertwined standard, as the district court did, we reach the conclusion that the directories

should receive full First Amendment protection. The commercial portions of the yellow pages directories are inextricably intertwined with the non-commercial portions.

**[8]** When commercial speech is "inextricably intertwined with otherwise fully protected speech," it would be "artificial and impractical" to apply different levels of scrutiny to the different speech components. *Riley v. Nat'l Fed'n of the Blind of N.C.*, 487 U.S. 781, 796 (1988). We treat the entirety of the intertwined speech as fully protected expression. *Id.* In contrast, speech with commercial and noncommercial components that are not inextricably intertwined is subject to the intermediate scrutiny of *Central Hudson. See Ass'n of Nat'l Advertisers, Inc. v. Lungren*, 44 F.3d 726, 730 (9th Cir. 1994).

The plaintiffs argue that the yellow page directories are similar to the speech in *Riley*. The law at issue in *Riley* limited the fee that a professional fundraiser could charge for soliciting charitable contributions, required a professional fundraiser to have an approved license, and required the fundraiser to disclose to potential donors the average percentage of gross receipts actually turned over to charities by the fundraiser within the previous twelve months. *Riley*, 487 U.S. at 804. The Court held that the solicitation of charitable contributions is protected speech, and it declined to apply the more deferential commercial speech principles to the portion of the statute that related to the professional fundraiser's profit from the solicited contribution. *Id.* at 796.

In contrast, the City cites *Fox* as an example of a presentation with commercial elements that can be separately regulated as commercial speech despite the inclusion of noncommercial elements. *Fox* considered the commercial character of a houseware sales party where the attendees also discussed home economics. *Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 472 (1989). The Court elaborated on the concept of inextricably intertwined speech it had first devel-

oped in *Riley* and held that the commercial speech and non-commercial speech were not inextricably intertwined.

> [T]here is nothing whatever 'inextricable' about the noncommercial aspects of these presentations. No law of man or of nature makes it impossible to sell housewares without teaching home economics, or to teach home economics without selling housewares. Nothing in the resolution prevents the speaker from conveying, or the audience from hearing, these noncommercial messages, and nothing in the nature of things requires them to be combined with commercial messages.

*Id.* at 474.

The district court here discussed both cases and concluded that the yellow pages Ordinance was "more like the restriction at issue in *Fox* and less like the state law in *Riley*." *Dex Media West, Inc. v. City of Seattle*, 793 F. Supp. 2d 1213, 1224 (W.D. Wash. 2011). It went on to explain:

> Unlike *Riley*—where the protected charitable solicitation could not be made without the compelled commercial disclosures—and like *Fox*—where housewares could be sold without teaching economics—nothing in the City's Ordinance nor in the nature of these directories requires that their noncommercial aspects, such as maps, listings, and street guides, be combined with advertising. The two aspects of these directories—the commercial and the noncommercial—are therefore not inextricably intertwined.

*Id.*

We disagree. *Fox* addressed clear advertising that tried to evade a regulation by "link[ing] a product to a current

debate," *Fox*, 492 U.S. at 475. That is not true for the phone book. It was not created to serve merely as a vehicle for the delivery of ads. The telephone directory started as just that, a directory of telephone numbers. The commercial elements came later and even today take up only a limited fraction of the space in the phone book.

That phone book companies depend economically upon advertisements to pay for the directories does not distinguish them from other forms of communications that plainly qualify for full First Amendment protection. As noted above, economic motive in itself is insufficient to characterize a publication as commercial.

The full First Amendment protection of newspapers, magazines, television shows, radio programs, and the like demonstrates that the inclusion of commercial material does not support treating those publications and broadcasts as commercial speech entitled to less First Amendment protection. A newspaper or magazine could be subscription-only and contain no advertisements, and broadcasters could similarly forego commercials and rely upon other sources of income. There is no legal requirement that these publications defray costs — or make profits — with advertising. But public broadcasting and *Consumer Reports* are the very limited exceptions, not the rule. The *Seattle Times* is owned by a private corporation and operated as a commercial enterprise, like the *New York Times*, the *Wall Street Journal*, and virtually all major American newspapers. So, too, are the commercial television and radio networks, their affiliates in Seattle, and the substantial majority of television and radio stations across the nation.

In *Riley*, the Court observed that "[r]egulation of a solicitation 'must be undertaken with due regard for the reality that solicitation is characteristically intertwined with informative and perhaps persuasive speech . . . , and for the reality that without solicitation the flow of such information and advo-

cacy would likely cease.' " *Riley v. Nat'l Fed'n of the Blind of N.C.*, 487 U.S. 781, 796 (1988) (quoting *Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620, 632 (1980)).

**[9]** Economic reality applies here, too. Without advertising, the *Seattle Times* would presumably not exist, as the *Seattle Post-Intelligencer* no longer does in printed form. That the yellow pages directories depend financially upon advertising does not make them any less entitled to protection under the First Amendment. *In S.O.C., Inc. v. County of Clark*, 152 F.3d 1136, 1144 (9th Cir. 1998), we held, on preliminary injunction review, that a merits challenge to a county ordinance would likely conclude that the ordinance "infringes on First Amendment protections accorded a party seeking to distribute noncommercial expressive material containing some form of commercial advertising" because it "may prohibit the distribution of newspapers, pamphlets, magazines, and other publications that contain some form of commercial advertising, even if the noncommercial content is unrelated to the advertising copy." *See also Hays Cnty. Guardian v. Supple*, 969 F.2d 111, 120 (5th Cir. 1992) ("The advertisements in the Guardian were included to finance the publication. Under such circumstances, commercial speech was inextricably intertwined with the newspaper's non-commercial speech, making the whole paper non-commercial."); *Ad World, Inc. v. Twp. of Doylestown*, 672 F.2d 1136, 1140 (3d Cir. 1982) (finding a tabloid to be fully protected speech because "each issue . . . contains noncommercial material deserving of full first amendment protection.").

The district court did not question the economic reality that confronts newspapers and broadcasters, as well as phone book publishers, but concluded that economic dependence was not sufficient to intertwine the commercial and noncommercial elements of the publication:

> While advertising may be a convenient way to defray the expense of the state-mandated directories,

> and while the noncommercial information may render receipt of the advertising contained in these directories more palatable to portions of the public, Plaintiffs point to no legal mandate or other circumstance requiring the combination of the commercial and noncommercial aspects in these directories.

*Dex Media West, Inc. v. City of Seattle*, 793 F. Supp. 2d 1213, 1225 (W.D. Wash. 2011). But no legal mandate requires the *Seattle Times* or the KING television station in Seattle to run ads, either.

To treat yellow pages directories as lesser-protected commercial speech because commercial content is published alongside noncommercial content, we would have to draw a distinction between the phone books and other publications that combine commercial and noncommercial speech with different underlying speakers, such as newspapers and magazines. The district court held that "commonsense — the touchstone of the commercial speech doctrine — dictates that the yellow pages directories should not receive the highest level of protection afforded by the First Amendment." *Id.* at 1223. But even if there is an intuitive distinction between yellow pages directories and protected media like newspapers, it does not necessarily follow that the First Amendment sanctions differential treatment on that basis.

The district court distinguished newspapers from yellow pages, saying that "newspapers have played an historic role in our democracy as conveyers of individual ideas and opinions . . . and are at the heart of historical justification for freedom of the press." *Id*. at 1225 (internal quotation marks omitted). That protection of newspapers was a driving force behind the adoption of the First Amendment does not limit the scope of the amendment's coverage.

The First Amendment does not make protection contingent on the perceived value of certain speech. "The First Amend-

ment's guarantee of free speech does not extend only to categories of speech that survive an ad hoc balancing of relative social costs and benefits." *United States v. Stevens*, 130 S. Ct. 1577, 1585 (2010); s*ee Brown v. Entm't Merchants Ass'n*, 131 S. Ct. 2729, 2737 n.4 (2011) ("Reading Dante is unquestionably more cultured and intellectually edifying than playing Mortal Kombat. But these cultural and intellectual differences are not *constitutional* ones. Crudely violent video games, tawdry TV shows, and cheap novels and magazines are no less forms of speech than The Divine Comedy, and restrictions upon them must survive strict scrutiny."). The First Amendment protects Hustler Magazine, too. *See Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46 (1988). Both newspapers and yellow pages directories contain noncommercial speech; a distinction in treatment on the basis of the perceived difference in worthiness of that noncommercial speech is not permitted.

The City argues that we should distinguish yellow pages directories from newspapers and similar media because it claims that the essence of the latter is still noncommercial, even though it is funded by advertising, whereas the essence of yellow pages directories is commercial. We are not persuaded by the City's attempts to distinguish the two on this basis.

To be sure, the Yellow Pages Companies are in the business of selling advertisements and contracted to distribute the noncommercial speech to make their advertising space more desirable due to greater directory use. But it is important to keep in mind that the First Amendment protections available to newspapers and similar media do not apply only to those institutions of the type who "have played an historic role in our democracy." To assume that every protected newspaper, magazine, television show, or tabloid's "noncommercial" content precedes and takes priority over the publishing parent company's desire to sell advertising is at odds with reality and the evidence in the record.

**[10]** Ultimately, we do not see a principled reason to treat telephone directories differently from newspapers, magazines, television programs, radio shows, and similar media that does not turn on an evaluation of their contents. A profit motive and the inclusion or creation of noncommercial content in order to reach a broader audience and attract more advertising is present across all of them. We conclude, therefore, that the yellow pages directories are entitled to full First Amendment protection.

### B.  The Ordinance Does Not Survive Strict Scrutiny

**[11]** Having reached the conclusion that the entire directories are fully protected under the First Amendment, we apply strict scrutiny to the Ordinance. *See Ass'n of Nat'l Advertisers, Inc. v. Lungren*, 44 F.3d 726, 730 (9th Cir. 1994). "With respect to noncommercial speech, this Court has sustained content-based restrictions only in the most extraordinary circumstances." *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 65 (1983). Such a regulation "is valid only if it is the least restrictive means available to further a compelling government interest." *Berger v. City of Seattle*, 569 F.3d 1029, 1050 (9th Cir. 2009) (en banc).

**[12]** The Ordinance does not satisfy this standard. While arguing that the Ordinance survives intermediate scrutiny under *Central Hudson,* the City advanced three governmental interests: (1) waste reduction, (2) resident privacy, and (3) cost recovery. *See* Seattle Ordinance 123427 (Oct. 14, 2010) (Preamble). We need not determine whether any or all of these interests are "compelling"; even if they are, the Ordinance is not the least restrictive means available to further them. One clear alternative is for the City to support the Yellow Pages Companies' own private opt-out programs. With proper implementation, the private opt-out programs could achieve precisely the same goals as the City's registry. Even fining the Yellow Pages Companies for a lack of compliance

with their own opt-out terms would be less restrictive than compelling them to fund and advertise the City's program.[4]

**[13]** Therefore, we hold that the Ordinance violates the First Amendment and cannot be maintained. We dismiss the appeal of the preliminary injunction as moot, reverse the district court's order granting summary judgment to the defendants, and remand for entry of judgment in favor of the plaintiffs. We do not reach the Commerce Clause and state law claims.

**DISMISSED in part; REVERSED and REMANDED in part.**

---

[4]We do not hold that implementation of any of these alternatives would necessarily be lawful. They simply demonstrate that the regulations imposed by the Ordinance were not the least restrictive means.